# Exhibit 2-D



**AlaFile E-Notice**

01-CV-2005-005778.00

Judge: ROBERT S VANCE

To: STILL W EDWARD
docket@votelaw.com

---

# NOTICE OF CASE DISPOSITION

---

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

### RICHARD GOODEN VS NANCY WORLEY ET AL
### 01-CV-2005-005778.00

The following matter was DISPOSED on 8/23/2006 10:56:43 AM

**I002 JONES ANDREW**

**MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56**

[Attorney: STILL W EDWARD]

| | |
|---|---|
| Disposition: | GRANTED |
| Judge: | RSV |
| Notice Date: | 8/23/2006 10:56:43 AM |

**ANNE-MARIE ADAMS**
**CIRCUIT COURT CLERK**
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
BIRMINGHAM, AL 35203

205-325-5355
anne-marie.adams@alacourt.gov

ELECTRONICALLY FILED
8/29/2006 9:56 AM
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| Richard Gooden, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | CV-2005-5778-RSV |
| | ) | |
| Nancy Worley, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS CERTIFICATION ORDER
## AND
## FINAL ORDER ON ALL PENDING ISSUES

## I. Introduction

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378 (1964).

Yet the power of a state to generally restrict felons' right to vote has withstood constitutional challenge. In *Richardson v. Ramirez*, 418 U.S. 24, 56, 94 S. Ct. 2655, 2671 (1974), the Supreme Court held that Section 2 of the Fourteenth Amendment allows states to "exclude from the franchise convicted felons. . . ."[1]

There are limitations to the State's ability to restrict felons' voting rights, however, as shown by *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916 (1985). There, the Supreme Court affirmed the Eleventh Circuit's opinion striking down the former Article

---

[1] Alabama has historically employed one of the nation's strictest disenfranchisement regimes and has a correspondingly high disenfranchisement rate. Note, Developments in the Law (Part VI): One Person, No Vote: The Laws of Felon Disenfranchisement, 115 Harv. L. Rev. 1939, 1943 (May 2002). According to one commentator, 6.75% of Alabama's voting-age population cannot vote. *Id*. at 1943-44, *citing* Christopher Uggen & Jeff Manza, The Political Consequences of Felon Disenfranchisement Laws in the United States 23 (Aug. 31, 2001) (unpublished manuscript, on file with the Harvard Law School Library).

VIII, § 182, of the Alabama Constitution of 1901. That constitutional provision had provided for the disenfranchisement of persons convicted of certain enumerated felonies and misdemeanors, as well as "any . . . · crime involving moral turpitude." The basis for the holding in *Hunter v. Underwood* was that racial discrimination was a substantial or motivating factor in the adoption of Section 182.

In so holding, the Supreme Court affirmed the Eleventh Circuit's opinion of *Underwood v. Hunter*, 730 F.2d 614 (11th Cir. 1984). The Eleventh Circuit's opinion included some facts similar to those of this case, which led to a pointed observation by that court:

> In determining whether an offense is a crime of moral turpitude, the registrars follow Alabama case law and, in the absence of judicial decision, opinions of the state attorney general. The registrars' actions in this case were based on opinions of the attorney general. In *Pippin v. State*, 197 Ala. 613, 73 So. 340 (1916), the Alabama Supreme Court defined a crime of moral turpitude as an act that is "immoral itself, regardless of the fact whether it is punishable by law. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude." *Id.* at 616, 73 So. at 342 (quoting *Fort v. City of Brinkley*, 87 Ark. 400, 112 S.W. 1084 (1908)). The attorney general in opinion has acknowledged that the classification of presently unaddressed offenses "will turn upon the moral standards of the judges who decide the question." Pl.Exh. 3; see also infra note 13. "Thus does the serpent of uncertainty crawl into the Eden of trial administration." McCormick, McCormick on Evidence § 43, at 85-86 (2d ed. 1972).

730 F.2d at 616 n. 2.

The State of Alabama responded to *Hunter v. Underwood* by passing Amendment 579 to the Alabama Constitution in 1996. This amendment provides the following:

> Article VIII of the Constitution of Alabama of 1901 is hereby repealed and in lieu thereof the following article shall be adopted.
>
> (a) Every citizen of the United States who has attained the age of eighteen years and has resided in this state and in a county

2

thereof for the time provided by law, if registered as provided by law, shall have the right to vote in the county of his or her residence. The Legislature may prescribe reasonable and nondiscriminatory requirements as prerequisites to registration for voting. The Legislature shall, by statute, prescribe a procedure by which eligible citizens can register to vote.

(b) No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability.

(c) The Legislature shall by law provide for the registration of voters, absentee voting, secrecy in voting, the administration of elections, and the nomination of candidates.

The term "moral turpitude" is nowhere defined in that amendment.

The plaintiffs here have brought suit challenging certain practices that have arisen since passage of Amendment 579. There is no challenge here like that of the *Hunter v. Underwood* case. The plaintiffs raise no claim of racial discrimination surrounding the passage of that amendment, nor do they claim that there exists an impermissible discriminatory impact.

Instead, this suit initially focused on the fact that state and county officials have used an overly expansive interpretation of Amendment 579 to bar *all* felons – and not just those convicted of crimes involving moral turpitude – from registering to vote. On behalf of a putative class comprising "all unregistered persons otherwise eligible to register to vote in Alabama who have been convicted of one or more felonies but who have not been convicted of any felonies involving moral turpitude," the named plaintiffs have now raised the following causes of action, as found in their *Fourth Amended Complaint*:

1.    The defendants' alleged refusal to register class members violates the rights of each class member under Amendment 579 and *Ala. Code* §17-3-9;

2.    The Alabama Secretary of State has also allegedly violated the class members' rights under Amendment 579 and *Ala. Code* § 17-3-9 by misrepresenting to county registrars what the voting rights of these members are;

3.    Plaintiffs Richard Gooden and Angela Thomas appeal from the registrars' refusal to register them under *Ala. Code* §17-4-124;

3

4.    The defendants have allegedly violated the rights of all class members under 42 U.S.C. § 1971(a)(2)(B); and

5.    Defendant Worley has allegedly violated the class members' due process and equal protection rights by promulgating voter registration forms that fail to comply with Amendment 579.

The *Fourth Amended Complaint* names Nancy Worley, in her official capacity as Alabama's Secretary of State, and Nell Hunter, in her official capacity as Jefferson County Registrar, as defendants. Defendant Hunter is further named as a representative of a defendant class defined as all voter registrars in the State of Alabama.[2]

On April 28, 2006, a hearing was held in this matter. The primary focus of the hearing was to determine whether this Court may properly certify the classes alleged by the plaintiffs, as must be decided under *Ala. Code* § 6-5-641. The Court took the opportunity to hear from the parties on other pending matters, moreover. This order comes from the Court's consideration of all pending filings and of the arguments made at that hearing.

The Court now faces a situation different from what existed at the time this action commenced. At the April 28 hearing, all parties agreed that a blanket refusal to register a citizen convicted of any felony was contrary to law. Instead, the current procedure is as described by counsel for defendant Worley:

> MS. FLEMING: Under Alabama law, discretion is vested with the County Board of Registrars to accept and reject applications and to determine which voter applications meet the requirements of the law. It's -- the statute that speaks to this says that the registrars are responsible for determining whether the applicant has satisfied the registrars that they in fact meet the qualifications for voting. And so what you have is really a statutory framework that puts the burden, in the first place, on the voter to demonstrate to the County Board of Registrars, in this case, Ms. Hunter, that the voter meets the relevant

---

[2] At the time of the April 28, 2006 hearing, the plaintiffs were traveling under the allegations of the *First Amended Complaint*. In that pleading, Ekeyesto Doss, a resident of Houston County, was also a named plaintiff, with the three Houston County registrars named as defendants. The Court regards the *Fourth Amended Complaint* as superseding prior amendments. Because neither Mr. Doss nor the Houston County registrars are identified as parties in the *Fourth Amended Complaint*, they must be dismissed from this action.

4

qualifications.

\* \* \*

MS. FLEMING:  The way the statutory scheme is set out, the Board of Registrars makes the initial determination and then if the application *[sic]* is dissatisfied with that, he has an automatic right to appeal that decision to this case *[sic]*.  And matter of fact, Mr. Gooden did exactly that in the case, he disagreed with the registrars decision, appealed to this Court, and although I wasn't involved, I understand Your Honor immediately had a conference call with the relevant parties and said it appears this is not a crime involving moral turpitude, can we agree that this man should be registered to vote, and that was done.  That's how the statutes sets the process up in more difficult cases.

(Transcript of April 28, 2006 hearing, at pp. 12-14).

## II. <u>Undisputed Facts</u>

### A.  <u>The Parties' Stipulated Facts</u>

At the April 28 hearing, the parties presented a *"Stipulation of Undisputed Facts*," which identified the following as undisputed:

1.      Each county in Alabama has a board of three voter registrars, except Jefferson, Barbour, and Talladega counties.  Jefferson County has one registrar, while Talladega County and Barbour County each has four.

2.      In 1995-1996, the Alabama Legislature proposed, and the people ratified, Act 95-443, which proposed a constitutional amendment (ultimately, Amendment 579) repealing Article VIII of the Constitution of Alabama of 1901 regarding voting.

3.      Plaintiff Richard Gooden is a 64-year-old African American of lawful voting age, a citizen of the United States and a lifetime resident of Birmingham, Alabama.  Plaintiff Gooden was registered to vote from the mid-1960s until 2000, when he was convicted of felony driving under the influence of alcohol (DUI).

4.      Plaintiff Andrew Jones is a 47-year-old African American of lawful voting age,

5

a citizen of the United States and a resident of Birmingham, Alabama. Mr. Jones was registered to vote from the mid-1970s until the early 1990s, when he was convicted of felony possession of drugs.

5.     *Ala. Code* § 17-4-136 provides as follows: "The Secretary of State may promulgate rules for the receipt of applications for registration and the expedient administration of those applications, but no person shall be registered until a majority of the board of registrars has passed favorably upon the person's qualifications."

6.     Defendant Nell Hunter, the Jefferson County Voter Registrar, is vested with the authority under *Ala. Code* § 17-4-136 to grant or refuse an individual's application to register to vote in Jefferson County.

7.     No authority is given to the Secretary of State under Alabama law either to register voters or to direct county boards of registrars with respect to the registration of particular voters. Pursuant to the Administrative Code of Alabama, however, the Secretary of State has removal power over members of boards of registrars.

8.     By order of the Alabama Supreme Court, dated October 22, 1999, two voter registration forms were approved pursuant to *Ala. Code* § 17-4-22, as set out in the Alabama Code Commissioner's Notes following that section. The first form is entitled "State of Alabama Agency-Based Voter Registration Form" and is known at "NVRA-1." The second form is entitled "State of Alabama Postcard Voter Registration Form" and is known as "NVRA-2."

9.     The Secretary of State makes available Form NVRA-1 (A/B) for use by the "voter registration agencies." The Secretary of State makes Form NVRA-2 available for printing and use as a mail-in application for voter registration.

10.     Forms NVRA-1 and NVRA-2 are voter registration applications containing this statement: "to register to vote in the State of Alabama, you must:   .   .   . have not been convicted of a felony, or if you have been convicted, you must have had your civil rights restored."

11.     Registrars throughout the State use Forms NVRA-1 and NVRA-2, or forms substantially similar, containing the statement that to be eligible to vote, the applicant must not have been convicted of a felony.

12.     The Secretary of State adopted regulations on January 10, 2001, regulating voter registration. See Ala. Admin. Code, Chapter 820-2-2. Section 820-2-2-.05 provides

that the "voter registration agencies" shall use the voter registration forms prescribed by the Secretary of State.

13.    The term "voter registration agencies" refers to those agencies listed in *Ala. Code* § 17-4-250.

14.    For years prior to 2005, the Jefferson County Registrar had a practice of denying the voting application of every person convicted of a felony, without first seeking to determine whether such felony had been determined by Alabama courts to "involve moral turpitude," and instructed every felon who sought to register to vote in Alabama to seek a Certificate of Eligibility from the Alabama Board of Pardons and Paroles.

15.    It is the current practice of the Jefferson County Registrar to permit felons whose only felony convictions are for crimes that do not involve moral turpitude, as that phrase is defined by the appellate courts of Alabama, to register to vote.  To determine whether particular felonies involve moral turpitude under Alabama case law, the Registrar consults both Attorney General's Opinion 2005-092, and attorneys, including staff attorneys employed as Assistant Attorneys General in the Office of the Attorney General, as needed. The Registrar does not consult the Secretary of State, who is not an attorney and who is not qualified to render legal advice.

16.    On March 18, 2005, the Alabama Attorney General issued Opinion 2005-092 which explained that a person convicted of a felony not involving moral turpitude remains eligible to vote and is therefore ineligible to apply to the Alabama Board of Pardons and Paroles for a Certificate of Eligibility.

17.    After the issuance of Attorney General's opinion 2005-092, the Alabama Board of Pardons and Paroles (hereafter the "Board") refused to issue certificates of eligibility to persons who had been convicted of felonies that were specifically identified in Attorney General's opinion 2005-092 as crimes not involving moral turpitude.

18.    In a press release dated May 17, 2005, the Board stated that individuals convicted of felony offenses not involving "moral turpitude," such as felony driving under the influence and felony possession of drugs, need not (and, in fact, cannot) apply for a Certificate of Eligibility since such individuals never lost their right to vote.

19.    After Attorney General's opinion 2005-092 was issued, in response to questions from various boards of registrars, the Secretary of State advised the registrars to continue their long-standing practices and not to make any changes to their practices until the Attorney General issued a response to legal questions posed by the Secretary of State and all the legal

and administrative issues were properly resolved.

20.    On January 10, 2006, Alabama Attorney General's opinion 2005-092 was distributed by the office of the Attorney General to all the county boards of registrars in Alabama by facsimile and by U.S. Mail, and county boards of registrars were invited to seek the opinion of the Alabama Attorney General if they needed legal assistance in determining whether a particular felony involved moral turpitude.

21.    From the time Act 95-443 was enacted until June 2003, the Office of Voter Registration was a separate and distinct state agency that was not under the umbrella of the Office of Secretary of State.  After June 2003, when the Office of Voter Registration was merged into the Office of Secretary of State, until her resignation in 2004, Anita Tatum, the former Director of the Alabama Office of Voter Registration, served as the Supervisor of the Voter Registration Division of the Office of Secretary of State.  From 1996 through 2004, Ms. Tatum and her staff provided all training to the county boards of registrars.  No other training was provided by the Office of Secretary of State.

22.    Notwithstanding the ratification by the people of Alabama of the constitutional amendment narrowing the scope of the State's felon disfranchisement law to those who had been convicted of crimes of moral turpitude, the Attorney General's Opinion, and the press release issued by the Board, the office of Defendant Hunter instructed plaintiff Gooden to apply to the Board for a Certificate of Eligibility.

23.    An employee of the Board telephoned the office of Defendant Hunter on September 21, 2005, to explain that Plaintiff Gooden was not disqualified from voting, since his felony conviction did not involve moral turpitude, and that a Certificate of Eligibility was thus unnecessary to enable his registration.

24.    The office of Defendant Hunter informed the Board that the office of the Secretary of State had advised them not to register individuals with felony convictions who had not obtained a Certificate of Eligibility, without regard to whether or not such felony convictions involved moral turpitude.

25.    In a June 20, 2005 letter to Plaintiff Jones, the Board explained that after reviewing his "application for a Certificate of Eligibility to Register to Vote, we have determined that you were convicted of possession of a controlled substance," which is a felony "that does not appear to this agency to involve moral turpitude."  The Board determined that, according to Amendment 579 of the Alabama Constitution, Mr. Jones' "conviction does not disqualify [him] from voting."  The Board therefore concluded that "we are closing our file on your application, as you do not need a certificate in order to be eligible

to register."

26.     In a June 30, 2005 letter to Plaintiff Jones, the office of Defendant Hunter stated that his Voter Registration Form could not be processed because "a person convicted of a felony offense is barred from voting, unless there has been a reinstatement of voting rights." The office of Defendant Hunter referred Plaintiff Jones to the Board to "get [his] voting rights restored."

27.     The preceding paragraph notwithstanding, and before his filing this lawsuit on December 19, 2005, Plaintiff Jones received a Voter Registration Card. The card instructed Jones as to his polling place for "all elections — except municipal." The card Jones received was a standard card issued by the Jefferson County Registrar to all voters. The "except municipal" designation did not limit Jones' right to vote but was instead intended to alert Jones that his polling place for municipal elections was in a different location from that shown on the card.

28.     Act No. 78-584, codified at *Ala. Code* § 17-4-124, provides, in pertinent part, the following:

> Any person to whom [voter] registration is denied shall have the right of appeal, without giving security for costs, within 30 days after such denial, by filing a petition in the circuit court in the county in which he or she seeks to register, alleging that he or she is a citizen of the United States over the age of 18 years having the qualifications as to residence prescribed by law and entitled to register to vote under the provisions of the Constitution of Alabama, as amended. Upon the filing of the petition, the clerk of the court shall give notice thereof to the district attorney authorized to represent the state in said county, who shall appear and defend against the petition on behalf of the state. The issues shall be tried in the same manner and under the same rules that other cases are tried in such court and by a jury, if the petitioner demands it. The registrars shall not be made parties and shall not be liable for costs. An appeal will lie to the Supreme Court in favor of the petitioner if taken within 42 days from the date of the judgment. Final judgment in favor of the petitioner shall entitle him or her to registration as of the date of his or her application to the registrars.

29.    The docket fee for a complaint or petition in the Circuit Court under *Ala. Code* § 17-4-124 is set by *Ala. Code* § 12-19-71.  Pursuant to *Ala. Code* § 12-19-70, moreover, the docket fee set by *Ala. Code* § 12-19-71 "may be waived initially and taxed as costs at the conclusion of the case if the court finds that payment of the fee will constitute a substantial hardship."

30.    According to the Fiscal Year 2004-2005 Annual Report (page 35) of the Alabama Board of Pardons and Paroles, there were 469 "pardons w/ restoration of civil & political rights granted" and 1,233 "voters [sic] rights restored."

31.    Alabama statutes require that the Board receive applications for Certificates of Restoration of Voter Registration Rights and either issue the certificate or inform the applicant why the certificate cannot be issued. The Board conducts an investigation concerning each application to determine if the applicant is eligible under the law to receive the certificate. If so, the certificate is issued.  If the applicant is ineligible to receive the certificate, a letter is sent to the applicant stating the reasons for the Board's decision.  If the applicant's conviction is not one that disenfranchises the applicant from voting, a letter is issued to the applicant so stating.

32.    The Board has mailed approximately 330 letters declining to restore rights.

33.    On March 29, 2006, the Secretary of State issued a letter to Alabama Voter Registrars that included the following statement: "The felon voter registration case is currently in Federal Court; therefore, our office cannot comment on this issue other than to say we continue to await guidance from the Courts or the Attorney General's Office on this matter before we give you any further information or advice."

34.    The Secretary of State submitted proposed voter registration forms to the Alabama Supreme Court on March 15, 2006.  The proposed forms contain language stating that citizens are eligible so long as they have not been convicted of a "disqualifying felony," which is a new term replacing the broader language used in the earlier forms.

35.    In response to the Secretary of State's request, the Alabama Supreme Court issued an order on April 19, 2006, advising that the Secretary of State (rather than the Court) has the authority to proscribe the form and contents of applications for voter registration pursuant to more recent legislation that supersedes *Ala. Code* §17-4-122.

10

B. <u>Additional, Undisputed Evidence Received at the April 28 Hearing</u>

In addition to the parties' stipulations, the Court received sworn and undisputed testimony from two witnesses at the April 28 hearing.

The plaintiffs first called Tonya Colvin, who is the administrative assistant for the Jefferson County Board of Registrars. Ms. Colvin testified about the current practice used to decide who should be purged from the Jefferson County voter rolls.[3] She receives a monthly list of all convictions from the Jefferson County Circuit Court.[4] She identifies those on the list who are currently registered to vote in Jefferson County and highlights their names. She initially referred the list to the District Attorney's office, but now sends it to the office of the County Attorney for Jefferson County. According to Ms. Colvin, the assistant county attorney would identify who on the list was convicted of a felony involving moral turpitude. Ms. Colvin thereafter purges those individuals from the voter rolls.

The second witness was Theo Lawson, an assistant county attorney for Jefferson County. Mr. Lawson testified that he has recently assumed the task of reviewing the list received from Ms. Colvin and determining which of those voters on the list have been convicted of crimes involving moral turpitude. To the extent he can, he relies on published appellate decisions that explicitly determine whether a particular crime is of that nature. If the crime at issue does not fall within that category – and most do not – Mr. Lawson then reviews the elements of the crime at issue, comparing them to the elements of those crimes that have been determined to involve moral turpitude. Mr. Lawson determines whether, by analogy, the felon should be disqualified from voting.

Having the opportunity to personally observe these witnesses as they testified, the Court has no doubt about their sincerity. The Court also does not question their good faith and their earnest desire to do the right thing under the law as they know it. Both Ms. Colvin and Mr. Lawson are conscientious and dedicated public servants. In making his decisions, moreover, Mr. Lawson draws upon considerable experience, having served for a number of years as an assistant district attorney and with numerous criminal convictions under his belt.

---

[3] The removal of disqualified individuals from voter lists is pursuant to *Ala. Code* §17-4-132 (although that section still refers to the former Section 182 of the Alabama Constitution, which was repealed by Amendment 579).

[4] Ms. Colvin further testified that she receives a similar list from the federal district court every month or two, and that at least every year, she receives lists of Jefferson County residents who have been convicted of felonies in other counties in Alabama.

There is no evidence before the Court addressing how any other county in this State is addressing this issue.

### C. Undisputed Evidence Received after the April 28 Hearing

Added in the *Fourth Amended Complaint* was plaintiff Angela Thomas. In support of the plaintiffs' summary judgment motion, plaintiff Thomas filed an affidavit, which has not been disputed. There, she testified that she was removed from the Jefferson County list of registered voters in August 2003 because of her conviction for felony possession of marijuana. She further testified that in 2005, she applied to the Board for the restoration of her voting rights, only to have her request denied because of the Board's determination that her crime was not one involving moral turpitude. To date, plaintiff Thomas is not registered.

Defendant Nell Hunter has filed a list of all citizens who have been removed from Jefferson County's voter rolls since 1996. The list spans 329 pages and identifies thousands of individuals.

## III. **Legal Analysis**

### A. Issues Raised by the Defendants' Pending Motions.

This Court would ordinarily begin with a Rule 23 analysis since class allegations have been raised. In this case, however, there are some other issues that are properly addressed before turning to that of class certification.

#### *(1). Defendants' motion to dismiss under Ala. Code § 17-4-124*

Pending is defendant Worley's motion to dismiss under Rule 12(b)(6). In this motion, Worley argues that Count Three of the *First Amended Complaint* constitutes an appeal of defendants' refusal to register the named plaintiffs, brought under *Ala. Code* § 17-4-124. (Counts Three and Four of the recently-filed *Fourth Amended Complaint* reiterate this claim.)

That statute expressly provides that in any such appeal, "[t]he registrars shall not be made parties. . . ." Instead, the statute provides for the State of Alabama to serve as the proper defendant. For that reason, this Court dismisses the claims brought under Counts Three and Four of the *Fourth Amended Complaint* to the extent that they are asserted against defendant Hunter or the putative defendant class. The Court instead recognizes the State of Alabama as the proper defendant under these Counts, and the State's pending motion to

intervene is therefore GRANTED. The Clerk of the Court is directed to add the State of Alabama as an additional defendant in this action. No additional service need be perfected with this substitution, given that the Alabama Attorney General's office has already appeared on behalf of defendant Worley (the State of Alabama and defendant Worley may sometimes be referred to hereafter as the "State defendants").

### (2). State Defendants' Motions to Dismiss Based the Sovereign Immunity Doctrine.

In both their motion to dismiss and their summary judgment motion, the State defendants raise the sovereign immunity defense to argue that no claims in this action may properly lie against them.

Guidance comes from *Patterson v. Gladwin Corp.*, 835 So.2d 137 (Ala. 2002). The Supreme Court there recognized that the sovereign immunity doctrine bars any claim seeking monetary relief against the coffers of this State. *Id.* at 142, *quoting* *State Docks Comm'n v. Barnes*, 225 Ala. 403, 405, 143 So. 581, 582 (1932); *see also* *Alabama Agr. & Mech. Univ. v. Jones*, 895 So.2d 867, 873 (Ala. 2004)("an action is one against the State when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiff's recovery of money from the State")(citations omitted).

The *Patterson* court also recognized exceptions to the bar of sovereign immunity. Actions brought to compel state officials to perform their legal duties, actions to preclude state officials from enforcing unconstitutional laws, and declaratory judgment actions seeking the construction of a statute all fall outside the bar of the sovereign immunity doctrine. *Patterson*, 835 So.2d at 142.

The Court agrees with the plaintiffs that the sovereign immunity doctrine is inapplicable here. The plaintiffs have asserted no claims for money damages. They are instead seeking an order directing the Secretary of State to perform her legal duties. By law, the Secretary of State is the chief elections official and "shall provide uniform guidance for election activities." *Ala. Code* §17-1-8. Further, the Secretary of State "may promulgate rules for the receipt of applications for voter registration and the expedient administration of those applications. . . ." *Ala. Code* § 17-4-136. Finally, and pursuant to the Alabama Supreme Court's order of April 19, 2006, the Secretary of State now has the statutory authority to determine the form and contents of voter registration applications.

The evidence presented at the April 28 hearing, moreover, confirms that in practice, the Secretary of State exerts considerable authority over the State's voter registrars in an

effort to promote a uniform administration of the State's voting laws. Ms. Colvin testified about a conference last November at which Secretary of State Worley addressed this very issue before an audience of personnel from the State's registrar offices. A transcript of that meeting, admitted into evidence, shows that Ms. Worley instructed those in attendance to maintain the *status quo* until clear guidance is received from the Attorney General's office or from the courts.

As the State defendants point out, *Ala. Code* § 17-4-136 does provide that any voter registration must be based on a board of registrars' favorable determination of that voter's qualifications. It is nonetheless clear from both the facts and the law that the Secretary of State plays an authoritative role in promulgating the general policies and procedures employed by the voting registrars of this State to decide voter qualifications.

The Court also agrees that the claims seeking declaratory judgment pertaining to the class members' voting rights fall outside of the sovereign immunity bar. The defendants do not really contend to the contrary.

This Court thus concludes that the State defendants' pending motions are due to be denied to the extent they are based on the sovereign immunity doctrine.

### (3). Mootness as to the Claims of the Named Plaintiffs.

In their pending motions, the defendants also raise a mootness argument with regard to the named plaintiffs. This argument bears some scrutiny.

At the time this action was first filed, plaintiff Gooden had live claims against the defendants. After the suit was filed, this Court entered an order on September 30, 2005, directing the office of the Jefferson County registrar to permit his registration pursuant to an agreement of the parties. Compliance with that order has led to plaintiff Gooden's registration. Moreover, defendant State of Alabama has confessed judgment with regard to Count Three of the *First Amended Complaint*. In view of these developments, occurring *after* the filing of this action, the defendants now argue that plaintiff Gooden's claims are

14

moot and he may not serve as the class representative.[5]

While plaintiff Gooden is currently registered in accordance with this Court's prior order, that order is conditional in nature, subject to rescission or alteration at any time before a final judgment is entered. Indeed, that order expressly recognizes that "[t]his relief is interim relief only, does not constitute final relief in the case, and shall be without prejudice to any other claims made in the complaint or any defenses to those claims that may be duly raised." In a hypothetical situation, a court could later determine that an order requiring the registration of a felon was erroneous and subsequently direct the registrar to remove that individual from the voting list. The Court thus does not regard its order of September 30, 2005, as constituting the kind of final relief that could moot Gooden's claims.

Nor may the defendants seek to preclude adjudication on a classwide basis by the State's confessing judgment on a designated representative's individual claim. In *Jones v. Southern United Life Ins. Co.*, 392 So.2d 822 (Ala.1981), the named plaintiff filed an action seeking monetary relief for herself and certification of a class action. Before any class-certification determination, the defendant tendered payment to plaintiff Jones of the monetary amounts she was claiming, which she accepted. The trial court thereafter granted the defendant's summary judgment motion on the plaintiff's individual claim and dismissed the remaining portions of the action.

On appeal, the Supreme Court in *Jones* identified the issue as "whether Mary Jones, whose claim is rendered moot through satisfaction, prior to certifying the class, may be permitted to have the class certified, and proceed to represent that class, even though she no longer has a real interest in the right to be protected." *Id.* at 823. The Court ultimately concluded that satisfaction of the plaintiff's individual claim did not prevent certification of the class. Further, "[n]otwithstanding the mootness of the suit as to Mary Jones, it is not moot as to other members of the class, and she can continue to litigate the issues as a representative of the class. . . . [S]he was not ousted as a representative of the class when her individual claim was mooted by payment of her claim. . . ." *Id.*

*Jones v. Southern United Life Ins. Co.* is clear authority for the proposition that a settlement by a class representative of individual claims does not moot the claims of the

---

[5] The Court regards this mootness argument as distinct from the analysis used to decide whether a class is properly certified under Rule 23 of the Alabama Rules of Civil Procedure. The U. S. Supreme Court has before recognized that the related requirement of standing is a prerequisite to be addressed before one even considers the Rule 23 factors. *See, e.g., Sosna v. Iowa*, 419 U. S. 393, 402-03, 95 S. Ct. 553, 558-59 (1975); *Allee v. Medrano*, 416 U. S. 802, 828-29, 94 S. Ct. 2191, 2206-07 (1974).

class. Its holding is not undercut by the later decision of *Pharmacia Corp. v. Suggs*, 932 So.2d 95 (Ala. 2005), even though the Supreme Court there held that settlement of the named plaintiffs' claims, before certification of the class as alleged in the complaint, divested the trial court from considering the class claims and mandated dismissal of the entire action. The difference is that in *Suggs*, the plaintiffs apparently declined to serve as class representatives once their claims had been settled, instead filing a motion to substitute new representatives in their place. The Court expressly distinguished *Jones*, instead of overruling it, stating that "[i]n *Jones*, the class representative sought to remain in the action and to proceed on behalf of the other class members. Here, the named plaintiffs are completely abandoning the action after unequivocally accepting a settlement and then trying to name new class representatives to take their place." 932 So.2d at 99.

The *Jones* decision, moreover, is in accord with the weight of authority to the effect that while a defendant's voluntary actions may moot individual claims, the claims of absent class members remain and the named plaintiffs, if so desiring, may continue to serve as class representatives. *See, e.g.*, *United States Parole Commission v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202 (1980); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854 (1975).

Because plaintiff Gooden desires to continue serving as a class representative, *Jones* rather than *Suggs* appears on point and permits him to do so. This Court further determines that the claims of plaintiff Thomas are not moot, given that she was removed from Jefferson County's voter rolls for a felony conviction and is currently not registered to vote.

Plaintiff Jones stands in a different light, however. According to the parties' stipulated facts, described above, plaintiff Jones was registered to vote even before this action was commenced. Although there had been some question about whether he would be permitted to register, that question was apparently resolved in his favor. At the time this action was filed, no live dispute existed between plaintiff Jones and any of the defendants. His motion to intervene as an additional plaintiff is therefore denied, and he may not serve as a representative of the proposed plaintiff class.

## B.  Class Certification Issues

Having resolved the preliminary motions, the Court now turns to the plaintiffs' request to certify plaintiff and defendant classes. In considering this request, this Court is mindful of its obligations as defined by the Supreme Court of Alabama:

> The trial judge is directed to conduct such proceedings as he deems necessary to determine whether the proponents of class

16

> certification have met their burden of proving each of the four
> elements of Rule 23(a) and at least one element of Rule 23(b).
> Any future order of the trial court certifying a class must identify
> each of the four elements of Rule 23(a), Ala. R. Civ. P., and
> must provide a written rigorous analysis of how the proponents
> of class certification have met their burden of proving these
> elements.   A certification order must also include a written
> rigorous analysis of how the proponents of class certification
> have met their burden of proving one of those elements of Rule
> 23(b), Ala. R. Civ. P.

*Ex parte Mayflower Nat. Life Ins. Co.*, 771 So.2d 459, 462 (Ala. 2000).

In the *Fourth Amended Complaint*, the proposed plaintiff class is defined as "[a]ll unregistered persons otherwise eligible to vote in Alabama who have been convicted of one or more felonies, but who have not been convicted of any felonies involving moral turpitude." Given the nature of the injunctive and declaratory relief sought, which would apply to all individuals convicted of any felonies, the Court instead regards as appropriate the following putative plaintiff class:

> Every citizen of the United States, currently residing in this
> State and 18 years of age or older, who has at any time been
> convicted of a felony in any jurisdiction and who is not, as of the
> date of this order, registered to vote in this State.

The following analysis addresses whether this proposed plaintiff class may properly be certified.

### (1).  Rule 23(a)-- Requirement of Numerosity

The first requirement under Rule 23(a) is numerosity.  More specifically, there must be substantial evidence that the class is "so numerous that joinder of all members is impracticable."  For purposes of Rule 23(a)(1), impracticability does not require a showing of  impossibility, but instead relates to the difficulty or inconvenience in joining all class members.  *See Cheminova America Corp. v. Corker*, 779 So.2d 1175, 1179 (Ala. 2000)(quoting and approving trial court's certification order).   Indeed, one noted commentator has observed that Rule 23(a)(1) establishes not a requirement of numerosity so much as a requirement that joinder be impractical, which requirement is to be evaluated based on the circumstances of every particular case. 1 Conte & Newberg, Newberg on Class Actions, § 3:3 (4th ed. 2002); *see also Cheminova*, 779 So.2d at 1179, *quoting, inter alia,*

17

*General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 100 S.Ct. 1698 (1980).

This Court does not have specific information regarding the size of the putative class; however, "[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." 1 Conte & Newberg, *supra*, at § 3:3; *see also Bradley v. Harrelson*, 151 F.R.D. 422, 426 (M.D. Ala. 1993).

The evidence before this Court suggests that the class would be a huge one. Defendant Hunter has filed with the Court a 379-page list of all convicted felons who have been removed from Jefferson County's voting rolls since 1996. Thousands of individuals appear on this list. While there is no similar information regarding any of Alabama's other 66 counties, there is also no doubt that the members of the proposed class number in the thousands, if not tens of thousands, scattered throughout the State.

With these considerations in mind, the Court concludes that the requirement of Rule 23(a)(1) has easily been met.

### (2). Rule 23(a) – Requirement of Commonality

Commonality, the second requirement under Rule 23, requires the plaintiffs to show that there exist common issues of law or of fact. The Alabama Supreme Court has recognized that a "common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Cheminova*, 779 So. 2d at 1180.

In the *Fourth Amended Complaint*, the following issues are asserted to be common:

1.    Whether defendant Worley instructed voter registrars to refuse, and whether voter registrars in fact refused, to register members of the plaintiff class to vote;

2.    Whether the defendants' actions violated the rights guaranteed to the plaintiff class by Alabama's constitution and laws;

3.    Whether the defendants violated the rights guaranteed to the plaintiff class by federal laws; and

4.    Whether members of the plaintiff class are entitled to declaratory and injunctive relief.

On reflection, this Court concludes that the overriding legal issues common to all members of the putative plaintiff class can be summarized by asking two questions: first, how should "moral turpitude," as that term is found in Amendment 579 to the Alabama Constitution, be defined; and second, who has the constitutional authority to establish such a definition? Because the answers to these questions will impact on the ability of all class members to register to vote, the commonality requirement is easily satisfied.

### (3).   Rule 23(a) – Requirement of Typicality

Typicality, the third requirement under Rule 23(a), "focuses on the interests of the class representatives." *Ex parte Government Employees Ins. Co.*, 729 So. 2d 299, 304 (Ala. 1999); <u>*see also*</u> *Warehouse Home Furnishing Distrib., Inc. v. Whitson*, 709 So. 2d 1144, 1149 (Ala. 1997)("[t]ypicality exists when a plaintiff/class representative's injury arises from or is directly related to a wrong to a class and that wrong to the class includes the wrong to the plaintiff").

The common issues in this action confront plaintiffs Gooden and Thomas just as they confront the members of the class they seek to represent. When he filed this action, Gooden stood in the same position as the class members, and he shared claims with the class members that raise such common issues. Plaintiff Thomas still shares such claims. By bringing this action to pursue their own self-interest, plaintiffs Gooden and Thomas are also pursuing the interests of the absent class members. If Gooden and Thomas have suffered legal injury, it was as a result of a generally, if not universally, observed policy at the time of refusing to register any convicted felon in this State. Even with recent developments that have modified the practice of voter registration, the interests of the named plaintiffs in clarifying and enforcing their civil rights are identical to the interests of the class members.

For these reasons, the typicality requirement of Rule 23(a) is satisfied.

### (4).   Rule 23(a)–Requirement of Adequacy

The Alabama Supreme Court has explained the "adequacy-of-representation" requirement of Rule 23(a) as follows:

> The adequacy-of-representation requirement "is typically construed to foreclose the class action where there is a conflict of interest between the named plaintiff and the members of the putative class." *General Tel. Co. v. EEOC*, 446 U.S. at 331, 100

S. Ct. 1698.   It also involves questions regarding whether the
attorneys representing the class are "qualified, experienced, and
generally able to conduct the proposed litigation." *Griffin v.
Carlin*, 755 F.2d 1516, 1533 (11th Cir.1985).   Adequacy of
representation requires that the class representative "have
common interests with unnamed members of the class" and that
the representative "will vigorously prosecute the interests of the
class through qualified counsel." *American Med. Sys.*, 75 F.3d
at 1083 (*quoting Senter v. General Motors Corp.*, 532 F.2d 511,
525 (6th Cir.1976)); *see also General Tel. Co. v. Falcon*, 457
U.S. at 157, 102 S. Ct. 2364.

*Cutler v. Orkin Exterminating Co., Inc.*, 770 So. 2d 67, 71 (Ala. 2000).

No conflict of interest appears -- plaintiffs Gooden and Thomas share with other class
members the interest in having their civil rights clarified so that they may know whether they
can properly be registered to vote.  Further, counsel for the plaintiffs possess the needed skill
and expertise to vigorously prosecute the interests of the proposed class, as made clear by the
history of their legal practice described in the plaintiffs' *Submission of Additional Evidence*,
filed on May 8, 2006.

The adequacy requirement of Rule 23(a) has been met.

### (5).   Rule 23(b)(2) -- the Appropriateness
### of Injunctive or Declaratory Relief

In addition to meeting the elements of Rule 23(a), the plaintiffs must meet one of the
prongs of Rule 23(b) before certification is proper.  The plaintiffs here base their class action
on Rule 23(b)(2), which "was drafted specifically to facilitate relief in civil rights suits."  8
Conte & Newberg, *supra*, § 25:20.  Especially since the plaintiff class would seek only
declaratory and injunctive relief, rather than money damages, this action is well-suited for
class treatment under Rule 23(b)(2).

### (6).   Considerations Involving the Proposed Defendant Class

The plaintiffs seek certification of not only a plaintiff class but a defendant class as
well.   Defendant Hunter does not oppose certification of a defendant class of voting
registrars, but this Court must still undertake a "rigorous analysis" to decide whether

certification is proper.

The propriety of certifying a defendant class in litigation similar to this one is discussed in 8 Conte & Newberg, *supra*, § 25:30:

> Defendant classes in criminal justice class action suits are an appropriate means of enhancing the effectiveness of a judgment and facilitating the administration of class relief when a practice is found to violate the civil and constitutional rights of a class of persons.  When the attorney for a class is confronted with a practice that has many administrative facets . . . a defendant class may be necessary to ensure the cooperation of all responsible officials in the implementation of a plan to eliminate the practice.  Likewise, in a situation which many autonomous bodies such as courts or municipalities are engaged in administering a statutory scheme violative of constitutionally protected rights, a defendant class may be useful, depending on the degree of coordination and cohesiveness of the agencies involved.

One example of a case involving plaintiff and defendant classes is *Richardson v. Ramirez*, 418 U.S. 24, 94 S.Ct. 2655 (1974), as described by the syllabus found at the beginning of the Supreme Court's decision:

> After the three individual respondents, who had been convicted of felonies and had completed their sentences and paroles, were refused registration to vote in three different California counties respectively because of their felony convictions, they brought a class petition, on behalf of themselves and all other ex-felons similarly situated, for a writ of mandate in the California Supreme Court, naming as defendants the Secretary of State and the three county election officials who had denied them registration "individually and as representatives of the class of all other" county election officials in the State, and challenging the constitutionality of respondents' disenfranchisement on the ground, *inter alia*, that provisions of the California Constitution and the implementing statutes that disenfranchised ex-felons denied them equal protection.

418 U.S. at 24, 94 S.Ct. at 2656; *see also Callahan v. Wallace,* 466 F.2d 59 (5th Cir.

21

1972)(involving plaintiff class against defendant class to end practice of adjudicating traffic violations before magistrates who have a financial interest in the outcome by recovering a portion of fines as compensation); *McKay v. County Election Com'rs for Pulaski County*, 158 F.R.D. 620 (E.D. Ark.1994)(in a suit against county election commissioners in Arkansas alleging violations of state and federal statutes concerning accessibility to polling places for disabled voters, the district court concluded that both plaintiff and defendant classes were properly certified).

Thoughtful analysis of the issues raised by certifying a defendant class is found in *Redhail v. Zablocki*, 418 F.Supp. 1061 (D.C.Wis. 1976), *aff'd*, 434 U. S. 374, 98 S.Ct. 673 (1978). A plaintiff class in that action challenged the constitutionality of a Wisconsin statute that required certain residents to obtain court permission before they could marry. The relief sought included a declaratory judgment that the statute was unconstitutional and an injunction restraining its enforcement. Having determined by prior order that a plaintiff class was proper, the court turned to whether the claims could be maintained against a defendant class:

> Plaintiffs seek to have this action maintained as a class action as to defendants under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The defendant class is defined in the complaint as "all county clerks of counties within the State of Wisconsin, all of whom are required by § 245.10(1) Wis.Stats. (1971) to refuse to issue marriage licenses to members of the class of plaintiffs without a court order." . . .

> Rule 23(a) prescribes the essential prerequisites that must be satisfied for any class action. They are satisfied here. First, the class of defendants, consisting of the seventy-two county clerks in Wisconsin, is "so numerous that joinder of all members is impracticable."Rule 23(a)(1). Next, there is a question of law common to all the members of the class the constitutionality of the challenged statute. Thirdly, the claims and defenses of the representative party, defendant Zablocki, are "typical of the claims or defenses of the class," Rule 23(a)(3), since Zablocki's contention that his action in refusing a marriage license to Redhail was justified by the statute would undoubtedly be asserted by the other county clerks. Finally, defendant Zablocki is a representative party who "will fairly and adequately protect the interests of the class," Rule 23(a)(4). Not only is defendant Zablocki's interest identical to that of the other county clerks,

but the attorney representing him is from the Milwaukee County Corporation Counsel's office which is experienced in conducting federal litigation. Furthermore, the Attorney General of Wisconsin has taken an active part in this action, urging that the challenged statute be upheld.

*Id.* at 1065-66.  The *Redhail* court then proceeded to analyze the circumstances under Fed.R.Civ.P. 23(b)(2):

A Rule 23(b)(2) class action is particularly appropriate in civil rights cases, although the rule is not so limited. 3B Moore's Federal Practice ¶ 23.40, at 23-651 23-654 (2d ed. 1974); C. Wright, Law of Federal Courts, § 72, at 312 (2d ed. 1970); Advisory Committee's Note to 1966 Amendment, 39 F.R.D. 102 (1966).  While the language of Rule 23(b)(2) does not expressly provide for its use where declaratory or injunctive relief is sought against a class, such class actions have been ordered. *Danforth v. Christian*, 351 F.Supp. 287 (W.D. Mo.1972); *Rakes v. Coleman*, 318 F.Supp. 181 (E.D. Va.1970); *Washington v. Lee*, 263 F.Supp. 327 (M.D. Ala.1966), *aff'd sub nom, Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L. Ed.2d 1212 (1968). *See*, 3B Moore's Federal Practice ¶ 23.40, 1974 Supplement, at 86.  Where, as here, a statute with statewide application is challenged on the ground of its unconstitutionality, allowing the action to proceed against the class of officials charged with its enforcement is in accordance with the interests of judicial administration and justice which Rule 23 is meant to further.

*Id.* at 1066.

This Court recognizes that the adequacy-of-representation requirement of Rule 23(a) is designed to guarantee due process for members of the class, who are absent from the court but whose interests are at issue.  The adequacy-of-representation requirement is especially important in defendant class actions because of the potential liability of all members of the class.  Here, however, the members of the defendant class do not face any personal liability because the plaintiffs seek only a declaration of legal rights and injunctive relief to protect those rights.

Defendant Hunter is represented by experienced, capable counsel from the office of

23

the county attorney for Jefferson County.  Further, counsel from the Alabama Attorney General's office, representing the State defendants, have been diligent in defending against the plaintiffs' claims here.  There is no indication that defendant Hunter has interests contrary to those of absent class members or that she would be less than diligent in defending those interests.  There is not even a suggestion that the plaintiffs have selected a weak or ill-suited representative to stand for the interests of the defendant class.

The Court here finds that the requirements of Rule 23, as it pertains to the proposed defendant class, are met.  With regard to numerosity, it appears that the proposed defendant class would comprise approximately 200 individuals, working in every county of the State.[6] The common issues identified earlier would apply equally to how every member of the defendant class performs his or her official duties.  Defendant Hunter's position appears no different from that of any other voter registrar, and no conflict is evident.

The requirements of Rule 23 have been met with regard to the proposed defendant class, which may be properly certified.

## C.  The Merits of this Action

### (1).  Introductory Analysis

Having addressed class certification, the Court now turns to the merits of this litigation.  With cross motions for summary judgment pending, the parties' stipulations and the other evidence before the Court demonstrate that no dispute of material fact exists in this matter.  Having reviewed the parties' filings and having considered the evidence carefully, this Court concludes that it may proceed to a final adjudication of this dispute.

The starting point is Amendment 579 to the Alabama Constitution.  Sub-paragraph (a) of that Amendment begins with the following sentence:

> Every citizen of the United States who has attained the age of eighteen years and has resided in this state and in a county thereof for the time provided by law, if registered as provided by law, shall have the right to vote in the county of his or her

---

[6]  Reiterating one of the parties' stipulations, "[e]ach county in Alabama has a board of three voter registrars, except Jefferson, Barbour, and Talladega counties.  Jefferson County has one registrar, and both Talladega County and Barbour County have four."  There are a total of 67 counties, meaning that the total number of registrars (assuming no vacancies) is 201.

residence.

This establishes the general right to vote for every United States citizen over 18 years of age who resides in the county in which he or she seeks to register. Sub-paragraph (b) of Amendment 579 qualifies this right:

> No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability.

Provisions in both sub-paragraphs (a) and (c) of Amendment 579 provide the Alabama Legislature with the authority to regulate voter registration:

> The Legislature may prescribe reasonable and nondiscriminatory requirements as prerequisites to registration for voting. The Legislature shall, by statute, prescribe a procedure by which eligible citizens can register to vote.

> *   *   *

> The Legislature shall by law provide for the registration of voters, absentee voting, secrecy in voting, the administration of elections, and the nomination of candidates.

Pursuant to such authority (or to that of predecessor provisions), the Legislature has enacted laws regarding the voter registration process. Absent, however, is any legislation that provides guidance as to what constitutes a crime involving moral turpitude. This Court has been unable to locate any statute in which the Legislature expressly defines or categorizes such crimes.[7] Instead, the Legislature has left the matter to the individual voter registrars of this State, who must each make independent decisions about which crimes involve moral

---

[7] Fairly read, *Ala. Code* §15-22-36(e)(1) might be regarded as specifically identifying crimes involving moral turpitude, although it does not purport to expressly make that determination and appears limited to the purposes of that statute.

turpitude.[8]

### (2).   Separation of Powers Concerns

Rather than trying to answer the question of what is moral turpitude, this Court perceives that the proper starting point is to determine who has the authority to define "a felony involving moral turpitude."  At the April 28 hearing, the State defendants argued for a process by which the voting registrars would assume the role of gatekeeper to decide whether a felon may properly register to vote.  A citizen disappointed with a registrar's determination could then file an appeal to the circuit court under *Ala. Code* §17-4-124; in that situation, a circuit judge would then decide whether the crime involved moral turpitude.[9]

Secretary of State Worley understandably has taken the position that she lacks the authority to determine which crimes involve moral turpitude.  As evidenced by Exhibit 11 to the *Stipulation of Undisputed Facts*, the Secretary of State sought guidance from the Alabama Attorney General's office in 2005, including a request for a list specifying which felonies involve moral turpitude.

Defendant Hunter does not contend that her office has the ability to categorize which crimes involve moral turpitude, as confirmed by the testimony of Ms. Colvin and Attorney Lawson that the county attorney for Jefferson County is currently being asked to make such determinations.

---

[8]   At the April 28 hearing, counsel for the State defendants discussed this situation:

The way this has been set up in Alabama's legislature is the decision initially rests with the Board of Registrars who are, with all due respect, probably very unqualified given that their only qualification is a high school education to make a determination of a matter of law.

(Transcript of April 28, 2006 hearing at p. 15).  This Court agrees with that characterization of the situation.  The registrars of this State are presumably diligent and conscientious public servants, but they are not required to have the legal education needed to make fine-line judgments about felony classifications.

[9]   In *Defendants' Supplemental Brief*, the State defendants advise the Court of recent legislation, Act 2006-570, which becomes effective on January 1, 2007, assuming that Justice Department pre-clearance is obtained.  This Act would revise what is now §17-4-124 (re-codifying it as §17-3-55) to provide that an appeal would initially lie with the probate court in the county where the petitioner resides, with further rights of appeal to the circuit court and the Alabama Supreme Court.  The reason for this change is not obvious, especially since under *Ala. Code* §12-13-31, a probate judge need not have a law license.  *See also* Amendment 328 to the Alabama Constitution of 1901, § 6.07 (By local law, however, the probate judges in Jefferson and Mobile counties are required to hold law licenses).

26

In its March 18, 2005 letter to the executive director of the Board of Pardons and Paroles, the Office of the Attorney General acknowledged that it "cannot provide an exhaustive list of every felony involving moral turpitude. . . ." (*Stipulation of Undisputed Facts*, Ex. 9). The letter did recognize prior court decisions in which particular crimes have been deemed to involve moral turpitude. According to the letter, there are approximately 15 felonies that have been declared to involve moral turpitude, including murder, rape, burglary, theft, and bigamy. The Attorney General's letter also specifies a handful of felonies that do not involve moral turpitude, such as assault, aiding a prisoner to escape, simple possession of marijuana and felony driving under the influence. It does not identify any decisions addressing how federal crimes or felonies from other jurisdictions are to be regarded.

From these facts, the defendants apparently perceive the State's courts as the proper authority to decide which crimes involve moral turpitude, notwithstanding the reliance on *post hoc*, subjective determinations to answer the question. If the defendants are correct, then -- given that this is a class action of all felons who are not registered to vote, and given the declaratory and injunctive relief that the class is seeking -- this Court could conceivably address the situation by promulgating an authoritative, exhaustive list of crimes involving moral turpitude. For the reasons that follow, this Court may not do so.

This conclusion results from the premise that disenfranchisement is a criminal penalty. The reality of the situation suggests that a deprivation of a right otherwise afforded to citizens of this State, solely and directly as a result of a criminal conviction, can only be a penalty for that conviction. This premise is not without challenge, however, as some have contended that such disenfranchisement statutes are non-penal in nature, instead serving as a means of civil regulation of the voting process.

A precedent for that stance is *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590 (1958). In *dicta* found in a plurality opinion, Chief Justice Warren described disenfranchisement statutes as an example of "a nonpenal exercise of the power to regulate the franchise." 356 U.S. at 97, 78 S.Ct. at 596. His view was that "a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose." 356 U.S. at 96, 78 S.Ct. at 595-96.

The idea that disenfranchisement is a method of regulating the franchise rather than punishing convicted criminals has been criticized by several commentators, however, as exemplified by the following analysis in Shapiro, Challenging Criminal Disenfranchisement Under the Voting Rights Act: A New Strategy, 103 Yale L. J. 537, 561 (1993).

> Disenfranchisement is most often defined as one of a number of nonpunitive civil disabilities that accompany a criminal

27

conviction.   Proponents of this view claim that criminal disenfranchisement protects "the purity of the ballot box" in two ways.   First, it prevents offenders from voting retributively against the criminal justice officials who prosecuted and convicted them.   However, the Supreme Court has stated that it is unconstitutional for a state to fence out a class of voters because of the way they might vote [*citing* Carrington v. Rash, 380 U.S. 89, 94 (1965)].   Second, defenders of the nonpunitive view claim that offenders are more likely to commit election crimes than are other citizens and that disenfranchisement of offenders is necessary, therefore, to safeguard the integrity of voting.  But courts have noted that states already have more effective ways of deterring election fraud, including penal codes against these offenses.

*See also* Ewald, Civil Death: The Ideological Paradox of Criminal Disenfrnachisement Law in the United States, 2002 Wis. L. Rev. 1045, 1058-59 (2002); Karlan, Ballots and Bullets: the Exceptional History of the Right to Vote, 71 U. Cin. L. Rev. 1345, 1367-68 & n. 136 (2003).

Since the *Trop* decision, moreover, the U.S. Supreme Court has paid considerably less deference to similar kinds of rationales for restricting registration in other contexts.  *See Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995 (1972)(state laws requiring would-be voters to comply with residency requirements do not further any compelling state interest and violate the equal protection clause of the Fourteenth Amendment, notwithstanding a "purity of the ballot box" rationale); *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 631-32, 89 S.ct. 1886, 1892 (1969) (despite a purported state interest in limiting school district elections to interested parties who are directly affected, a law restricting the right to vote in local school board elections was not narrowly tailored to serve that interest).

The "purity of the ballot box" view appears to have been first articulated in *Washington v. State*, 75 Ala. 582 (1884), where the Alabama Supreme Court held that disenfranchising those convicted of certain felonies, in accordance with a provision of the Alabama Constitution of 1875, was not a penalty so as to implicate the federal constitution's prohibition of *ex post facto* laws.  The rationale for the decision was the court's conclusion that voting was a privilege rather than a right.  This concept of voting was subsequently established by the Alabama Constitution of 1901, at Article I, Section 33.   The constitutionality of this provision, while never before considered, is called into doubt given the motivations surrounding many of the provisions of the 1901 Constitution. *See generally*

*Underwood v. Hunter*, 730 F.2d 614 (11th Cir. 1984).[10]  In any event, this interpretation of voting can no longer be good law in light of sub-paragraph (a) of Amendment 579, which provides the right to vote to all adult citizens residing in this State.  *See also Reynolds v. Sims*, 377 U.S. at 562, 84 S.Ct. at 1381("since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized").

In short, this Court regards the whole "purity of the ballot box" rationale as nothing more than a contrived rationalization to cover up efforts to prevent black citizens from voting, as poll taxes and literacy tests once did.  It thus may not be regarded as a legitimate basis for disenfranchising convicted felons.  This Court also rejects any argument that such disenfranchisement would prevent voter fraud, agreeing with the commentary that the "[p]revious commission of a felony does not logically lead to future commission of electoral fraud, nor does previous non-commission of a felony rule out the possibility of future electoral fraud; one has no bearing on the other."  Note, <u>Voting – Not Quite a Fundamental Right? A Look at Legal and Legislative Challenges to Felon Disenfranchisement Laws</u>, 89 Minn. L. Rev. 231, 261 (2004).  No rational or legitimate state interest is served by disenfranchising convicted felons other than as a form of punishment for the commission of certain crimes.

Observing *Richardson v. Ramirez*, 418 U.S. 24, 94 S.Ct. 2655, this Court does not take issue with a penal view of a disenfranchisement law such as that found in sub-paragraph (b) of Amendment 579.  That being so, however, this Court must hold that it lacks the constitutional authority to decide which crimes involve moral turpitude.  Because disenfranchisement is a criminal penalty, flowing directly and solely from a conviction, only the Alabama Legislature may determine the crimes to which this penalty attaches.

Section 43 of the Alabama Constitution of 1901 establishes the separation-of-powers doctrine in our state government:

> In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never

---

[10]    The president of the 1901 Alabama constitutional convention declared to his fellow delegates: "And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State." OFFICIAL PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF ALABAMA, MAY 21ST, 1901, TO SEPTEMBER 3RD, 1901, vol. 1, at p. 8 (1901)(statement of John B. Knox).

> exercise the legislative and judicial powers, or either of them;
> the judicial shall never exercise the legislative and executive
> powers, or either of them; to the end that it may be a government
> of laws and not of men.

The Alabama Supreme Court recently recognized that the courts must not only exercise care to avoid usurping the functions of the other branches of government but also assume primary responsibility for protecting the autonomy of each branch. *Birmingham-Jefferson Civic Center Authority v. City of Birmingham*, 912 So.2d 204, 212 (Ala. 2005), *quoting Piggly Wiggly No. 208, Inc. v. Dutton*, 601 So.2d 907, 911 (Ala.1992).

It is axiomatic in our modern American jurisprudence that the Legislature alone has the authority to "define crime and fix the punishment for the commission thereof. . . ." *Woco Pep Company v. City of Montgomery*, 213 Ala. 452, 454, 105 So. 214, 215 (Ala. 1925); *accord McDavid v. State*, 439 So. 2d 750, 751 (Ala. Cr. App. 1983); *State v. Campbell*, 21 Ala. App. 303, 304, 107 So. 788, 789 (Ala. App. 1926). The U.S. Supreme Court, for example, has before recognized that "defining crimes and fixing penalties are legislative, not judicial, functions." *United States v. Evans*, 333 U.S. 483, 486-87, 68 S. Ct. 634, 636 (1948); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 486, 113 S. Ct. 2194, 2200 (1993)("the primary responsibility for fixing criminal penalties lies with the legislature"), *citing Rummel v. Estelle*, 445 U.S. 263, 274, 100 S. Ct. 1133, 1139 (1980); *Gore v. United States*, 357 U.S. 386, 393, 78 S. Ct. 1280, 1284 (1958).

This view has been codified at *Ala. Code* § 13A-1-4, which provides that "[n]o act or omission is a crime unless made so by this title or by other applicable statute or lawful ordinance." Further, while under *Ala. Code* §13A-5-2(e), a court may exercise its authority to "forfeit property, dissolve a corporation, suspend or cancel a license or permit, remove a person from office, cite for contempt or impose any other lawful civil penalty" by including an order to such effect as a part of a convicted defendant's sentence, the commentary to that statute emphasizes that "[s]uch penalty could be part of the judgment only where the statute that authorizes the penalty permits the procedure." It is the Legislature's prerogative to determine the penalties for every crime. This Court would usurp that constitutional authority if it were to catalogue those crimes for which disenfranchisement may properly be imposed.

Our Supreme Court has made clear that such judicial activism has no place in our judicial system. The "equity funding cases" exemplify the kind of judicial restraint that is instead mandated here. In *Ex parte James*, 713 So. 2d 869 (Ala. 1997), a plurality opined that while the judiciary held an abstract authority to remedy unconstitutional deficiencies in Alabama's schools, it would not attempt this task, instead recognizing that "the legislature . . . bears the primary responsibility for devising a constitutionally valid public school

30

system." *Id.* at 882 (quotations omitted). Accordingly, the opinion vacated the trial court's remedial plan and originally directed the Alabama Legislature to formulate a constitutional education system. *Id.* at 882. That order was later vacated, and ultimately in *Ex parte James*, 836 So. 2d 813 (Ala. 2002), a plurality of the Court found that the issues pertaining to school financing were non-justiciable, thereby precluding continued court oversight:

> Continuing the descent from the abstract to the concrete, we now recognize that any specific remedy that the judiciary could impose would, in order to be effective, necessarily involve a usurpation of that power entrusted exclusively to the Legislature. Accordingly, compelled by the authorities discussed above -- primarily by our duty under § 43 of the Alabama Constitution of 1901 -- we complete our judicially prudent retreat from this province of the legislative branch in order that we may remain obedient to the command of the people of the State of Alabama that we "never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men." Ala. Const.1901, § 43 (emphasis added).

*Id.* at 819. Any remedy that this Court might fashion – in the exercise of deciding which crimes involve moral turpitude – would similarly "involve a usurpation of that power entrusted exclusively to the Legislature."

Although Alabama's appellate courts have before addressed cases that raise the issue of which crimes involve moral turpitude, a review of these cases – as identified in the exhibit to the plaintiffs' *Submission of Additional Evidence* – reveals that in none did a party raise a separation-of-powers argument in an effort to preclude such a judicial determination. With this issue as the foremost concern here, however, this Court declines to engage in the kind of judicial activism required to comprehensively answer the question posed in this case. This Court must instead defer to the other branches of our state government to enact whatever legislation they deem proper to effectuate the mandate of sub-paragraph (b) of Amendment 579 to the Alabama Constitution.

This conclusion is supported by explicit provisions of Amendment 579 recognizing the Legislature's suzerainty to implement its terms. Again quoting from sub-paragraph (a) thereof, "[t]he *Legislature* may prescribe reasonable and nondiscriminatory requirements as prerequisites to registration for voting" (emphasis added). That constitutional grant of authority is precisely what is at issue here.

Just as this Court lacks the power to designate crimes for which disenfranchisement may properly be imposed as a punishment, so too are the Secretary of State, the Attorney General, county boards of registrars and county attorneys precluded from making such determinations – for any such governmental official or agency to do so would usurp the role of our Legislature to declare, by duly-enacted legislation, when this punishment is properly imposed.

### (3). Due Process Issues

Even were the separation-of-powers doctrine of no concern, the current situation raises a second constitutional infirmity. The impossibility of defining -- with any reasonable precision -- the term "moral turpitude," as found in Amendment 579, gives rise to significant due process concerns.

At the time Amendment 579 was enacted, Alabama's appellate courts had made several efforts to define this term. For example, in *Ex parte McIntosh*, 443 So.2d 1283, 1284 (Ala. 1983), the Supreme Court relied on the following definition found in C. Gamble, McElroy's Alabama Evidence, § 145.01(7) (3d ed. 1977):

> The Supreme Court of Alabama has defined the term "moral turpitude" on many occasions and the following are the most commonly found definitions. Moral turpitude signifies an inherent quality of baseness, vileness and depravity. It is immoral in itself, regardless of the fact that it is punished by law. Therefore, an offense for conviction of which a witness' credibility is lessened must be *mala in se* and not *mala prohibitum.*

Similarly, in *Williams v. State*, 55 Ala. App. 436, 437, 316 So. 2d 362, 363 (Ala. Crim. App. 1975), the Court of Criminal Appeals relied on a summary of the meaning of moral turpitude found in McElroy, Law of Evidence in Alabama, Vol. I, § 145.01(7):

> "Moral turpitude signifies an inherent quality of baseness, vileness, depravity." *Gillman v. State*, 165 Ala. 135, 51 So. 722. Moral turpitude 'implies something immoral itself, regardless of the fact whether it is punishable by law. The doing of the act, and not its prohibition by statute fixes the moral turpitude.' *Pippin v. State*, 197 Ala 613, 73 So. 340. Moral turpitude means 'something immoral in itself. * * * It must not be merely *Mala*

32

*prohibita*, but the act itself must be inherently immoral. The doing of the act itself and not its prohibition by statute, fixes the moral turpitude. * * * It is the nature of the act itself, and not its legislative characterization or punishment which must be the test in determining whether or not it involves moral turpitude." *Ex Parte Marshall*, 207 Ala 566, 93 So. 451 (471).

To be blunt, such definitions provide no meaningful guidance on how to distinguish between those felonies that do involve moral turpitude and those that do not. This Court agrees with the conclusion of one commentator that "'moral turpitude' is an elusive, vague and troublesome concept in the law, incapable of precise definition; such is evidenced by the myriad of definitions and interpretations in judicial opinions." Wilson, <u>The Definitional Problems with "Moral Turpitude,"</u> 16 J. Legal Prof. 261 (1991).[11]

Nor is this problem a recent one. Back in 1979, a member of the Morgan County Board of Registrars requested an attorney general's opinion, framing her request as follows:

> I would like to request an opinion from your office concerning the disenfranchisement of voters for the conviction of certain offenses. I am especially interested in those crimes involving moral turpitude.

> The disqualifying offenses are listed in Article 8, Section 182 of the 1901 Constitution *[now repealed and replaced by the new Section 177]*. I feel certain that some of these offenses may no longer be disqualifying due to recent federal or state court judgments. I am in hopes that your office might provide me with some form of an updated list.

> *It has always been difficult and confusing to determine those crimes involving moral turpitude which might keep someone from voting. I would especially appreciate any help or some form of a list of these crimes.*

---

[11] This Court is reminded of former Justice Potter Stewart's famous quip in *Jacobellis v. State of Ohio*, 378 U.S. 184, 84 S. Ct. 1676 (1964). After acknowledging the difficulty in intelligibly defining obscenity, Justice Stewart figuratively threw his hands up in the air by proclaiming "[b]ut I know it when I see it, and the motion picture involved in this case is not that." 378 U.S. at 197, 84 S. Ct. at 1683 (Stewart, J., concurring). Given the difficulties in defining "moral turpitude," it must be wondered whether any judge or other official can honestly arrive at even that kind of conclusion.

192 Ala. Op. Atty. Gen. 16 (1979)(emphasis added). The attorney general's response was along the lines of that recently provided to the executive director of the Board of Pardons and Paroles, discussed in the parties' stipulations of fact, *supra*, in that it failed to provide a workable definition and instead resorted to listing those reported appellate decisions that have identified certain crimes one way or the other.

Under the current process, those attempting to interpret and apply sub-paragraph (b) of Amendment 579 must make *post hoc* decisions, using subjective assessments of what felonies are particularly immoral so as to fall in the category of moral turpitude. This Court has no doubt that when assistant county attorney Theo Lawson attempts to undertake that task, for example, he does so with skill, diligence, and a conscientious desire to do his job correctly. His decisions, however, may differ from those of an equally skilled and conscientious official undertaking the same task elsewhere. A crime that one may regard as involving moral turpitude, the other may regard as not. The problem is, if anything, made worse if the decision-makers are voter registrars who lack the familiarity that attorney Lawson possesses with our criminal justice system. Nor can a court review any such decision without using its own subjective assessment, armed with only the language from the above-quoted cases that shine precious little light on the matter.

At this juncture, the Eleventh Circuit's observation of this problem in the *Underwood v. Hunter* decision bears repeating:

> The attorney general in opinion has acknowledged that the classification of presently unaddressed offenses "will turn upon the moral standards of the judges who decide the question." Pl.Exh. 3; see also infra note 13. "Thus does the serpent of uncertainty crawl into the Eden of trial administration." McCormick, McCormick on Evidence § 43, at 85-86 (2d ed. 1972).

730 F.2d at 616 n. 2. There are numerous such serpents, as shown by the following examples:

(A).    Contrast *Finley v. State*, 661 So. 2d 762 (Ala. Crim. App. 1995) -- which held that felony DUI does not involve moral turpitude – with *Jarrard v. Clayton County Board of Registrars*, 262 Ga. 759, 425 S.E.2d 874 (1993), where the Georgia Supreme Court found that multiple convictions of felony DUI would render the crime to be one involving moral turpitude. If the distinction is explained by the number of convictions, how many are needed to transmogrify the crime into one of moral turpitude?

34

(B).    The crime of moral turpitude in *Williams v. State*, quoted above, was sodomy. The Court of Criminal Appeals concluded there that homosexual conduct, even if consensual, was a crime involving moral turpitude, characterizing the offense "as abominable, detestable, unmentionable, and too disgusting and well known to require other definition or further details or description." 316 So.2d at 365. Today, while "deviate sexual intercourse" -- defined in *Ala. Code* §13A-6-60 – is still illegal, it is now only a misdemeanor under *Ala. Code* §13A-6-65(a)(3). Under changing societal standards, it would no longer serve as the basis of disqualification under the language of Section 177(b) of the Alabama Constitution.

(C).    Selling marijuana is a crime of moral turpitude. *Jones v. State*, 527 So. 2d 795 (Ala.Crim.App. 1988). Selling cocaine isn't, at least not according to *Pippin v. State*, 197 Ala. 613, 73 So. 340 (Ala. 1916).[12]

(D).    Here in Alabama, simple possession of marijuana is not a crime of moral turpitude. *See Ex parte McIntosh*, 443 So. 2d 1283 (Ala. 1983). Conceptions of right and wrong apparently depend on where you live, however. In Oklahoma, for example, a misdemeanor charge of simple possession of marijuana is a crime of moral turpitude, at least in the context of disciplinary proceedings against an attorney. *See State ex rel. Oklahoma Bar Ass'n v. Denton*, 598 P.2d 663 (Okla. 1979).

(E).    In *Meriwether v. Crown Inv. Corp*., 289 Ala. 504, 268 So. 2d 780 (Ala. 1972), the Alabama Supreme Court concluded that income tax evasion was a crime of moral turpitude. That Court later held that "the failure to pay income taxes, as opposed to the failure to file an income tax return," is not a crime involving moral turpitude. *Clark v. Alabama State Bar*, 547 So.2d 461 (Ala. 1989). When it comes to assessing the "quality of baseness, vileness and depravity," this Court has difficulty distinguishing between these crimes.

This Court's disagreement is not with any prior determination of what is, or is not,

---

[12]    The *Pippin* decision has never been overruled. In *Ex parte McIntosh*, 443 So. 2d 1283 (Ala. 1983), it was suggested that the *Pippin* decision resulted from the fact that selling cocaine at that time was a misdemeanor. That, in and of itself, demonstrates how fluid society's conceptions of right and wrong can be. It should also be pointed out that in *Ex parte Bankhead*, 585 So. 2d 112, 122 (Ala. 1991), the court recognized that a crime involving "the unauthorized sale of a controlled substance" was a crime of moral turpitude. It cited no authority for this proposition, and the "controlled substance" at issue there was unspecified.

35

moral turpitude.  The problem is the uncertainty that would inevitably result from differing "moral standards," which we are forced to employ in the absence of statutory pronouncements making clear to all citizens which crimes are those that would subject the guilty to the additional penalty of loss of voting rights.

In *Ross Neely Express, Inc. v. Alabama Department of Environmental Management*, 437 So. 2d 82 (Ala. 1983), the Supreme Court recognized that every citizen of Alabama enjoys the right to due process as guaranteed under the Alabama Constitution of 1901, Article 1, Sections 6 and 13.  This right applies in both civil actions and criminal proceedings.  *Id.* at 84, *citing Pike v. Southern Bell Telephone and Telegraph Co.*, 263 Ala. 59, 81 So. 2d 254 (1955).

Due process requires that a State provide meaningful standards to guide the application of its laws.  *See Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858 (1983).  "The touchstone of due process is protection of the individual against arbitrary action of government."  *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986), *quoting Dent v. West Virginia*, 129 U.S. 114, 123, 9 S.Ct. 231, 233 (1889).

In the *Ross Neely* case, the Alabama Supreme Court first noted that this right is violated when a statute or regulation is unduly vague, unreasonable, or overbroad, then quoted from *Kahalley v. State*, 254 Ala. 482, 48 So. 2d 794 (1950), in which a criminal misdemeanor statute was found to be unconstitutionally vague:

> [L]egislation may run afoul of the due process clause because of a failure to set up any sufficient guidance to those who would be law-abiding, or to advise a defendant of the nature and cause of an accusation he is called on to answer, or to guide the courts in the law's enforcement.

437 So.2d at 84.  The overbreadth doctrine has historically applied when First Amendment rights of free speech are at issue.  The Alabama Supreme Court has recognized a broader application of this doctrine, however, to protect a citizen's due process rights from overbroad legislation, as recognized in *Scott & Scott, Inc. v. City of Mountain Brook*, 844 So. 2d 577 (Ala. 2002), *citing Ross Neely*, 437 So. 2d at 85.

In *Jordan v. De George*, 341 U.S. 223, 71 S. Ct. 703 (1951), the United States Supreme Court addressed the issue of whether the crime of conspiracy to defraud the U. S. Government of taxes on distilled spirits involved moral turpitude so as to require deportation of an alien who had been twice convicted and sentenced for such a crime.  The majority of the Court rejected the petitioner's argument that the statutory phrase fell afoul of the void-

36

for-vagueness doctrine.  The dissent – Justice Jackson writing for himself and Justices Black and Frankfurter – refuted the majority opinion in such compelling fashion that extended quotation thereof is helpful:

> What the Government seeks, and what the Court cannot give, is a basic definition of "moral turpitude" to guide administrators and lower courts. (341 U. S. at 233, 71 S. Ct. at 709).
>
> Congress did not see fit to state what meaning it attributes to the phrase "crime involving moral turpitude."  It is not one which has settled significance from being words of art in the profession.  If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral.  The Government confesses that it is "a term that is not clearly defined," and says: "The various definitions of moral turpitude provide no exact test by which we can classify the specific offenses here involved."  (341 U. S. at 234-35, 71 S.Ct. at 709-10).
>
> Except for the Court's opinion, there appears to be universal recognition that we have here an undefined and undefinable standard.  The parties agree that the phrase is ambiguous and have proposed a variety of tests to reduce the abstract provision of this statute to some concrete meaning.  (341 U. S. at 235, 71 S. Ct. at 710).
>
> Respondent suggests here, and the Government has on other occasions taken the position, that the traditional distinction between crimes *mala prohibita* and those *mala in se* will afford a key for the inclusions and exclusions of this statute.  But we cannot overlook that what crimes belong in which category has been the subject of controversy for years.   This classification comes to us from common law, which in its early history freely blended religious conceptions of sin with legal conceptions of crime.  This statute seems to revert to that practice. (341 U. S. at 236-37, 71 S. Ct. at 710-11).
>
> The Government, however, offers the *mala prohibita*, *mala in*

*se* doctrine here in slightly different verbiage for determining the nature of these crimes. It says: "Essentially, they must be measured against the moral standards that prevail in contemporary society to determine whether the violations are generally considered essentially immoral." Can we accept "the moral standards that prevail in contemporary society" as a sufficiently definite standard for the purposes of the Act? This is a large country and acts that are regarded as criminal in some states are lawful in others. We suspect that moral standards which prevail as to possession or sale of liquor that has evaded tax may not be uniform in all parts of the country, nor in all levels of "contemporary society." How should we ascertain the moral sentiments of masses of persons on any better basis than a guess? (341 U.S. at 237-38, 71 S. Ct. at 711).

There have, however, been something like fifty cases in lower courts which applied this phrase. No one can read this body of opinions and feel that its application represents a satisfying, rational process. If any consistent pattern of application or consensus of meaning could be distilled from judicial decision, neither the Government nor the Court spells it out. Irrationality is inherent in the task of translating the religious and ethical connotations of the phrase into legal decisions. The lower court cases seem to rest, as we feel this Court's decision does, upon the moral reactions of particular judges to particular offenses. What is striking about the opinions in these 'moral turpitude' cases is the wearisome repetition of cliches attempting to define "moral turpitude,". . . . But the guiding line seems to have no relation to the result reached. The chief impression from the cases is the caprice of the judgments. How many aliens have been deported who would not have been had some other judge heard their cases, and vice versa, we may only guess. That is not government by law. (341 U.S. at 239-40, 71 S. Ct. at 712).

Uniformity and equal protection of the law can come only from a statutory definition of fairly stable and confined bounds. (341 U. S. at 242, 71 S. Ct. at 713).

This Court recognizes that it is relying on the dissent in the *Jordan v. De George* case. The majority found that under the circumstances of that case, no constitutional violation was

evident.  Our jurisprudence was much different at the time of that case, however.  The "separate but equal" doctrine of *Plessy v. Ferguson* was still good law, for example, and there have been numerous decisions of the U. S. Supreme Court that have subsequently broadened the parameters of due process rights.

In *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902 (1976), the U. S. Supreme Court recognized that "[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances," *quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748 (1961).  Rather than a fixed notion, "due process is flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600 (1972).

This view is exemplified by the decision in *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018 (1970).  In *Williams*, the U. S. Supreme Court invalidated on equal protection grounds a venerable practice of extending prison terms beyond the statutory maximum when a defendant was unable to pay a fine or court costs, explaining as follows:

> [N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack . . .
>
> The need to be open to reassessment of ancient practices other than those explicitly mandated by the Constitution is illustrated by the present case since the greatly increased use of fines as a criminal sanction has made nonpayment a major cause of incarceration in this country.

*Id.*, at 239-240, 90 S.Ct. at 2021.

Because this analysis focuses on due process considerations under the Alabama Constitution, moreover, this Court has the leeway to recognize developments in the law of due process in the 55 years since the *Jordan v. De George* decision.  It is therefore proper to rely on the current state of the law in deciding the due process implications involved.

*Mathews* described a test involving three factors for determining whether a particular procedure is constitutionally adequate:  (1) the private interest at stake;  (2) the risk that existing procedures will wrongly impair this private interest, and the likelihood that additional procedural safeguards can effect a cure; and (3) the governmental interest in

avoiding these additional procedures.  *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903.[13]

The private interest at stake is the right to vote, which – as was quoted at the beginning of this order -- has been recognized in *Reynolds v. Sims* as "the essence of a democratic society."  The U. S. Supreme Court later characterized the right to vote as "a civil right of the highest order." *Oregon v. Mitchell*, 400 U.S. 112, 139, 91 S. Ct. 260, 272 (1970). This right implicates others, moreover.  Under *Ala. Code* § 12-16-60, a citizen is qualified to serve on a jury only if he or she "has not lost the right to vote by conviction for any offense involving moral turpitude."  Several appellate courts have also recognized that the right to sit on a jury is one of our fundamental civil rights.  <u>*See United States  v. Maines*</u>, 20 F.3d 1102, 1104 (10th Cir. 1994); *United States v. Thomas*, 991 F.2d 206, 214 (5th Cir.), <u>*cert. denied*</u>, 510 U.S. 1014, 114 S. Ct. 607 (1993); *United States v. Cassidy*, 899 F.2d 543, 549 (6th Cir.1990); *United States v. Gomez*, 911 F.2d 219, 221 (9th Cir.1990).

The second *Mathews* prong focuses on the fairness and reliability of existing procedures.  Following Justice Jackson's dissent in *Jordan v. De George*, what is in place now puts an individual's  right to vote at the mercy of subjective discretion that is unguided by any meaningful standards.  As an aspect of this second prong, moreover, it appears that this problem is easily remedied along the lines of what the separation-of-powers doctrine mandates in any event – for the Alabama Legislature to enact legislation specifying which felonies are to be regarded as involving moral turpitude.

The final *Mathews* factor asks whether the State of Alabama has a legitimate interest in preserving the *status quo* of a standardless, *post hoc* determination of which felonies deprive a citizen of the right to vote.  There appears no legitimate interest in maintaining the *status quo.*  Replacing the current process by one in which duly-enacted legislation identifies those crimes involving moral turpitude would appear to benefit all parties, plaintiffs and defendants alike, by promoting clarity and consistency.

This analysis may be seen as flying in the face of a number of cases from Alabama's appellate courts that purport to define crimes that either do or do not involve moral turpitude. How can this Court be so concerned about the matter when the appellate courts of this State have periodically undertaken this task without such concern?  A thorough review of those cases fails to disclose a single instance in which a party claimed a violation of due process

---

[13]  Alabama's appellate courts have before recognized the *Mathews* balancing test.  <u>*See, e.g., Wild v. Wild*</u>, ___ So.2d ___, 2006 WL 1120653 (Ala. Civ. App. 2006); *Morgan County Dept. of Human Resources v. B.W.J.*, 723 So. 2d 689, 693 (Ala. Civ. App. 1998); <u>*see also Hayes v. Alabama State Bar*</u>, 719 So. 2d 787, 791 (Ala. 1998)(See, J., concurring).

rights resulting from such a *post hoc* determination. This particular issue has apparently not been presented to Alabama's appellate courts for adjudication.

If possible, this Court must interpret Amendment 579 to be in harmony with fundamental due process rights provided by other provisions of the Alabama Constitution. If two provisions of our Constitution are in conflict, and one of them is contained in Article I (the Declaration of Rights), that provision must prevail. *State ex rel. Galanos v. Mapco Petroleum, Inc.*, 519 So. 2d 1275, 1277 (Ala.1987), *quoting In re Dorsey*, 7 Port. 293, 359 (Ala.1838). There is no conflict between Amendment 579 and those due process rights established under Sections 6 and 13 of the Alabama Constitution, however, so long as Amendment 579 is applied in the proper manner.

In entering this order, this Court does not intend to disparage the dedication or good faith of the named defendants, or of the defendant class members, in any way. To the contrary, this order is with the assumption that the defendants are dedicated, well-intentioned servants of the public. Given the overriding importance of the civil rights at stake, however, a system that deprives citizens of those rights based on the guesses of even such well-intentioned public servants fails to pass constitutional muster. In the absence of meaningful standards on which the defendants can base their decisions, the refusal to register members of the plaintiff class would violate their due process rights under the Alabama Constitution.

### (4).  *Adjudicating the Plaintiffs' Claims*

The above analysis of the separation-of-powers and due process problems is made in the context of adjudicating those claims based on Amendment 579 to the Alabama Constitution and *Ala. Code* §17-3-9. Given the above conclusions, a judgment in favor of the plaintiff class is due to be entered on Counts One and Two of the *Fourth Amended Complaint*, as well as on Count Six thereof, to the extent that that Count is based on the rights of the plaintiff class under Amendment 579 to the Alabama Constitution and *Ala. Code* §17-3-9. In view of the constitutional infirmities addressed above, sub-paragraph (b) of Amendment 579 may not be enforced until there is legislation effectuating its purpose and clarifying its scope. Absent such legislation, the right to vote provided by sub-paragraph (a) of Amendment 579 stands without qualification.[14]

The plaintiff class is therefore entitled to a declaration that the defendants may not

---

[14]  This Court does not address the prohibition pertaining to the "mentally incompetent" found in sub-paragraph (b) of Amendment 579.

41

impede their rights to register and to remain on the voting lists simply because of prior felony convictions. The plaintiff class is further entitled to injunctive relief restraining the defendants from further efforts to prevent members of the plaintiff class from registering.

The Court now turns to the other claims of the *Fourth Amended Complaint*. Plaintiffs Gooden and Thomas may not prevail on their individual claims under *Ala. Code* §17-4-124. Gooden's claim is moot, and Thomas has waited too long to bring her claim under this statute. The Court declines to address any class claims that may arise under this statute; indeed, it is dubious that adjudication on a classwide basis is possible given the 30-day time bar of that statute.

Count Five alleges a violation of 42 U.S.C. §1971(a)(2)(B). After closely studying that statute, however, this Court concludes that it is inapplicable to the facts here. All claims under this Count must therefore be dismissed.

Count Six also raises equal protection/due process claims under both state and federal constitutions with regard to voter registration forms. Employing the due process analysis hereinabove, this Court concludes that the plaintiff class is entitled to a judgment on these claims based on the determination that the defendants' actions in preventing them from registering violate their due process rights under the Alabama Constitution. This Court declines to reach any federal claims.

### D.  Attorneys' Fees Petition

The plaintiffs have pending a motion for the award of attorneys' fees, based on 42 U.S.C. §1988. The Alabama Supreme Court has recently (and unanimously) held that Article I, Section 14 of the Alabama Constitution of 1901 prohibits such an award against state officials in their official capacity. *See Ex parte Town of Lowndesboro*, ____ So.2d ____, 2006 WL 1304902 (Ala., May 12, 2006). On the other hand, as the Court held in *James v. Alabama Coalition for Equity, Inc.*, 713 So.2d 937 (Ala.1997), the doctrine of sovereign immunity does not preclude an award of attorneys' fees under 42 U.S.C. §§ 1983 and 1988.

The plaintiffs here have alleged some claims under 42 U.S.C. §1983. This Court either rejected or did not reach the plaintiffs' federal claims, however, instead basing its conclusions on state law grounds. The first question is whether the *Lowndesboro* rule applies to foreclose any award.

There is a somewhat curious line of cases dealing with whether an award of attorneys' fees may be ordered even if relief is on only state law claims, provided those claims share a

42

nucleus of fact with accompanying federal claims. In *Davis v. Everett*, 443 So.2d 1232 (Ala. 1983), the plaintiff brought an action against city commissioners, alleging that their denial of her liquor license application violated her rights under both state and federal constitutions. The trial court found in her favor on the state law claim, and apparently did not address the federal claim brought under 42 U.S.C. § 1983. The trial court also denied her request for attorneys' fees. On appeal, the Supreme Court reversed on the following basis:

> It is not necessary here to equate equal protection under the Constitution of 1901, Art. I, §§ 1, 6, and 22, with equal protection under the United States Constitution for all purposes; however, the Alabama Constitution necessarily embraces at least the minimal requirements of the United States Constitution. Defendants violated plaintiff's equal protection rights under the Alabama Constitution. It may also follow that plaintiff's federal constitutional rights were violated; she alleged a substantial federal claim, which was not dismissed, and ultimately prevailed on her state constitutional claim. The *Gibbs* test was satisfied because both claims arose from a common nucleus of operative facts. Accordingly, Mrs. Davis was a prevailing party under § 1988.

*Id.* at 1236.[15]

After *Davis v. Everett* came *Federation of City Employees v. City of Birmingham*, 492 So.2d 1304 (Ala. 1986), which was an appeal from the trial court's denial of the plaintiff's motion for attorneys' fees under 42 U.S.C. § 1988, with the following facts involved:

> The employees initially filed suit under 42 U.S.C. § 1983, alleging violations of both federal constitutional law and state law, in order to obtain a three percent (3%) pay raise provided in Budget Ordinance Number 83-103, which had been adopted by the Birmingham City Council. The trial court granted summary judgment in favor of the employees, but specifically stated that the constitutional due process claim alleged by the employees was premature and that no decision concerning it

---

[15] The "*Gibbs* test" referred to in this quote comes from *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130 (1966). *Gibbs* actually addresses the proper basis for a federal court's exercise of pendent jurisdiction over state law claims. The U. S. Supreme Court there found that such jurisdiction applies if the state and federal claims are derived from the same nucleus of facts.

would be rendered.

Id. at 1305.  In affirming the denial of fees, the Supreme Court relied on *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457 (1984) -- which followed the *Davis v. Everett* decision – to conclude that "a prevailing plaintiff may be awarded reasonable attorney fees based on a substantial, unaddressed constitutional claim, if that claim is reasonably related to the ultimate success."  *Id.* at 1306.  If the federal claim fails to present a justiciable issue -- for example, if the federal claim is unripe -- then it cannot be reasonably related to the ultimate success achieved by a plaintiff.

This case appears closer to *Davis v. Everett* than to the *Federation of City Employees* case.  While the Court rejected the plaintiffs' federal claim under 42 U.S.C. §1971, the plaintiffs' equal protection/due process claims under Count Six were not reached, with the Court's ruling instead premised on its analysis of state constitutional rights. The claims of Count Six, and the due process analysis used in resolving the other claims in the plaintiffs' favor, however, certainly suggest that at least to some extent, relief to the plaintiffs could have been based on federal constitutional claims.  An attorneys' fee award thus appears proper under the authority of the *Davis* case.  The question then becomes what amount is properly awarded.

The governing law on this issue was most recently addressed in *Beal Bank, SSB v. Schilleci*, 896 So.2d 395 (Ala. 2004).  The Supreme Court there first recognized the factors established in *Peebles v. Miley*, 439 So.2d 137 (Ala. 1983), which a court may consider in judging the reasonableness of an attorneys' fee request:

> (1) the nature and value of the subject matter of the employment;  (2) the learning, skill, and labor requisite to its proper discharge;  (3) the time consumed;  (4) the professional experience and reputation of the attorney;  (5) the weight of his responsibilities;  (6) the measure of success achieved;  (7) the reasonable expenses incurred;  (8) whether a fee is fixed or contingent;  (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services;  (11) the likelihood that a particular employment may preclude other employment;  and (12) the time limitations imposed by the client or by the circumstances.

896 So.2d at 403.  Not every one of these factors must be considered in every case, however; rather, the *Peebles* list provides considerations that may factor into an analysis depending on the circumstances of a given case.  *Id.*  This Court has considerable discretion in weighing

44

the factors involved and may undertake its own evaluation of the value of services made the subject of an application. *Id.*, *quoting Dent v. Foy*, 214 Ala. 243, 249, 107 So. 210, 216 (1925). This Court is, however, obligated to explain any determination made for the benefit of any appellate review. *Id.*, at 404-05.

The Court first addresses the measure of success achieved. While the plaintiffs may not have prevailed on all their claims, the relief provided herein appears to be all that the plaintiffs could have asked for (indeed, the relief can be regarded as exceeding the plaintiffs' prayer since this Court's analysis goes beyond the issues explicitly raised by the parties). As a result of this order, the defendants are obligated to revamp their procedures for registering voters, so that no one may be denied the right to register because of a prior felony conviction (at least not until there is legislation implementing sub-paragraph (b) of Amendment 579). This change is significant in its scope and nature, and it affects all members of the class, of which there are thousands.

This litigation has raised significant issues, impacting on the fundamental civil rights of thousands of citizens residing in this State. For this reason, the Court places emphasis on the first *Peebles* factor identified above, which is "the nature and value of the subject matter of the employment." This also calls into play the second *Peebles* factor in that this type of litigation requires specialized knowledge and experience in voting rights litigation in order to effectively prosecute the claims of class members. The uniqueness of this kind of case, in and of itself, bears consideration.

The Court further finds that the plaintiffs' local counsel, Edward Still, enjoys a well-deserved reputation as a preeminent voting rights attorney. This reputation is based on his experience dating back many years. Attorney Ryan Haygood is a much younger attorney, having been in practice since 2001. It appears that for the past three years, however, he has worked primarily, if not exclusively, on this type of litigation.

The Court recognizes the affidavit testimony of attorneys Jack Drake, Jim Blacksher, Gayle Gear, and Alicia Haynes, also experienced attorneys in this area of law who enjoy a top-notch reputation. Based on their testimony, it appears that an hourly rate of at least $250 would be proper, with some of these affiants contending that a higher rate is warranted given the nature of the work. Attorneys Blacksher and Drake testify that a 100% enhancement of the lodestar amount would be proper.

Attorney Still has provided time logs showing that approximately 112 hours were logged on this matter. Attorney Haygood's records reflect 117 hours logged. This case did not require extensive discovery, and the parties were not required to participate in a trial of this matter. On the other hand, the attorneys did have to prepare for a class certification

hearing. The stipulations of fact reflect a good deal of work by the attorneys for all parties, moreover, and this litigation required briefing on numerous thorny issues of law.

The time billed does appear a bit excessive however, and after reviewing the records, this Court determines that a reasonable time for which an award is proper is 101 hours for Mr. Still and 105 hours for Mr. Haygood. This Court further determines that a reasonable hourly billing rate for Mr. Still is $350, while that of Mr. Haygood is $260. These lead to a calculation of $35,350 in fees for Mr. Still and $27,300 in fees for Mr. Haygood. Further, the Court recognizes that Mr. Still has incurred expenses of $1,295, while Mr. Haygood has incurred expenses of $2,079.

This Court declines to recognize an enhancement of the loadstar amounts, given that the plaintiffs enjoyed only partial success, and that success was in part on grounds having nothing to do with federal constitutional rights that could form the basis of an award under 42 U.S.C. §1988 (e.g., the separation-of-powers analysis leading to the conclusion that sub-paragraph (b) of Amendment 579 may not currently be enforced). On the other hand, given the scope of the issues presented in this case and the fundamental significance of the rights for which redress is herein provided, no reduction of the loadstar amounts appears warranted, either.

This Court therefore awards to Mr. Still $36,645 in fees and expenses and to Mr. Haygood $29,379 in fees and expenses. These amounts are taxed as costs to both the State defendants and to the defendant class of registrars, with the understanding that a county registrar is a state officer. *See*, *e.g.*, *Garner v. McCall*, 178 So.2d 210, 212 (Ala. 1938); *Mitchell v. Wright*, 69 F.Supp. 698, 702 (M. D. Ala. 1947). The defendants are ordered to remit these costs directly to the plaintiffs' attorneys.

## IV.  Conclusion

The Court recognizes that this order changes a practice that dates back many years. There have been various contexts in which courts have addressed whether particular crimes involve moral turpitude, with scant attention paid to any constitutional concerns. Upon recognizing that the disenfranchisement provision of Amendment 579 to the Alabama Constitution authorizes the imposition of a criminal penalty, however, the situation changes. Our constitutional rights mandate that government tread carefully in imposing punishment for crimes, given the significance of the consequences. Under modern American jurisprudence of criminal law, for example, well-developed procedures are in place to ensure that any criminal punishment constituting a deprivation of liberty is in accord with every citizen's fundamental protections under our state and federal constitutions.

46

We are not dealing with any deprivation of liberty; at issue here is the possible deprivation of a citizen's fundamental right to vote as a result of a criminal conviction. From the evidence before the Court, thousands of citizens residing in Jefferson County alone have incurred this punishment for their wrongs. Let there be no mistake: the State of Alabama does have the constitutional authority to impose such a criminal penalty, and this order should not be regarded as holding to the contrary. Any imposition of this type of penalty, however, must be in keeping with the protections we all enjoy under our state and federal constitutions, meaning that it must be done in the right way.

In the absence of any legislative pronouncement, neither this Court nor any other court has the constitutional authority to decide whether an individual must surrender his right to vote because of a prior felony conviction. Neither this Court nor any other court may engage in a *post hoc* determination of the nature of a crime, for such a task must necessarily depend on individual concepts of right and wrong as well as guesswork about what "moral turpitude" actually means, all in violation of every citizen's right to due process.

Just as this Court may not make such decisions, by the same token the defendants may not either. The task is one for our Legislature to undertake. Only the Legislature has the constitutional power to decide which crimes involve moral turpitude so as to justify the removal of a fundamental civil right for which so many have fought and died. This Court cannot here restrict the Legislature's power, moreover. So long as the decision-making process is free of illegal discriminatory motivation, it is the Legislature's prerogative to decide which, if any, felonies are to be regarded as involving moral turpitude.

All this Court can do now is decide what happens pending any such action by the Alabama Legislature. This Court sees only one choice. Given the fundamental nature of the right at stake, and the language of Amendment 579, the Court must conclude that every citizen otherwise eligible to register in this State may not be denied that right solely by virtue of a prior felony conviction. Until such time that there is a statute on the books specifying which crimes may properly serve as a basis of disenfranchisement, no defendant may take any action to interfere with a citizen's registration because of any criminal conviction.

In accordance with the above, the following is hereby ORDERED:

1.    Ekeyesto Doss is dismissed as a plaintiff in this action. The Houston County registrars – Anita Gibson, Walter Long, and Molly Meadows -- are dismissed as defendants/class action representatives.

2.    Andrew Jones is also dismissed as a plaintiff.

47

3.    The State of Alabama's motion to intervene is GRANTED, and the State is added as a defendant, specifically with regard to Counts Three and Four of the *Fourth Amended Complaint.*  Counts Three and Four are dismissed as to defendant Hunter and the defendant class defined below.

4.    The defendants' summary judgment motions are GRANTED as to Counts Three, Four and Five of the *Fourth Amended Complaint.*  As to the other counts, the defendants' pending motions are DENIED.

5.    The following plaintiff class is hereby certified:

> Every citizen of the United States, currently residing in this State and 18 years of age or older, who has at any time been convicted of a felony in any jurisdiction and who is not, as of the date of this order, registered to vote in this State.

Attorneys Edward Still and Ryan P. Haygood are appointed to serve as counsel for this class.

6.    The following defendant class is hereby certified:

> Every individual duly appointed and presently serving in an official capacity as a registrar for the purpose of conducting, supervising or otherwise regulating the registration of voters in the county where such individual resides.

Defendant Hunter is designated to serve as representative of this class.

7.    The Court hereby DECLARES that the policy and practice previously promulgated or employed by the defendants of denying voter registration to an individual otherwise qualified to vote, but who had been convicted of *any* felony, violated Amendment 579 to the Alabama Constitution.  This policy and practice further violated the due process rights of the plaintiff class members provided by the Alabama Constitution.  The named defendants, all members of the defendant class, and all those who work with or on behalf of any of the defendants or defendant class members, are ORDERED immediately to cease and desist in refusing voter registration on this basis.

8.    Unless and until the Alabama Legislature passes, and the Governor signs into law, legislation specifically identifying which felonies involve moral turpitude, and unless and until any such duly-enacted legislation receives the necessary pre-clearance from the U.S. Justice Department, the named defendants, all members of the defendant class, and all

48

those who work with or on behalf of any of the defendants or defendant class members, are ENJOINED from refusing to register any individual, otherwise qualified to vote, on the ground that the individual has previously been convicted of a felony.

9.     Unless and until the Alabama Legislature passes, and the Governor signs into law, legislation specifically identifying which felonies involve moral turpitude, and unless and until any such duly-enacted legislation receives the necessary pre-clearance from the U.S. Justice Department, the named defendants, all members of the defendant class, and all those who work with or on behalf of any of the defendants or defendant class members, are ENJOINED from promulgating, distributing or employing voter registration application forms that refer in any way to a prior criminal conviction as a basis of disqualification. The defendant Secretary of State is further ORDERED to revise existing voter registration application forms to delete any such references.

10.     Unless and until the Alabama Legislature passes, and the Governor signs into law, legislation specifically identifying which felonies involve moral turpitude, and unless and until any such duly-enacted legislation receives the necessary pre-clearance from the U.S. Justice Department, the named defendants, all members of the defendant class, and all those who work with or on behalf of any of the defendants or defendant class members, are ENJOINED from removing from voter lists any registered voter by reason of that voter's conviction of a felony.

11.     The Court understands that pursuant to Section 5 of the federal Voting Rights Act, pre-clearance from the U. S. Justice Department is required before any change to existing voting policies and procedures may be implemented.  Counsel for the State defendants are therefore ORDERED to promptly submit this order to the U. S. Justice Department for review under the federal Voting Rights Act and to provide to this Court a copy of any such submission. Counsel for the State defendants are further ordered to thereafter keep this Court apprised of developments regarding the Justice Department's review process.  Pending such review, the provisions of this order effectuating a change in the current policy and practice of registering voters, specifically the orders of paragraphs 8-10 above, are STAYED.

12.     As chief elections officer for the State of Alabama, defendant Worley is further ORDERED promptly to deliver copies of this order to all members of the defendant class.

13.     Attorneys' fees and expenses in the amount of $ 36,645 are hereby awarded to attorney Edward Still and $29,379 are awarded to attorney Ryan Haygood.  These fees and expenses are taxed as costs to the defendants, who are ordered to make payments directly to the plaintiffs' counsel.

49

14.     This order concludes this litigation.  All other costs are taxed as paid.


DONE and ORDERED on this 23rd day of August, 2006.



/s/ Robert S. Vance, Jr.
Circuit Judge

cc:    W. Edward Still, Esq.
       Ryan P. Haygood, Esq.
       Margaret L. Fleming, Esq.
       Jeffrey M. Sewell, Esq.