(Slip Opinion)    OCTOBER TERM, 2007    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RILEY, GOVERNOR OF ALABAMA *v.* KENNEDY ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

No. 07–77.  Argued March 24, 2008—Decided May 27, 2008

Section 5 of the Voting Rights Act of 1965 (VRA) requires "covered jurisdictions" to obtain preclearance from the District Court for the District of Columbia or the Department of Justice (DOJ) before "enact[ing] or seek[ing] to administer" any changes in their practices or procedures affecting voting.

Alabama is a covered jurisdiction.  As of its November 1, 1964 coverage date, state law provided that midterm vacancies on county commissions were to be filled by gubernatorial appointment.  In 1985, the state legislature passed, and the DOJ precleared, a "local law" providing that Mobile County Commission midterm vacancies would be filled by special election rather than gubernatorial appointment.  In 1987, the Governor called a special election for the first midterm opening on the Commission postpassage of the 1985 Act.  A Mobile County voter, Willie Stokes, filed suit in state court seeking to enjoin the election, but the state trial court denied his request.  Although Stokes immediately appealed to the Alabama Supreme Court, the special election went forward and the winner took office.  Subsequently, however, the Alabama Supreme Court reversed the trial court's judgment, finding that the 1985 Act violated the State Constitution.

When the next midterm Commission vacancy occurred in 2005, the method of filling the opening again became the subject of litigation.  In 2004, the state legislature had passed, and the DOJ had precleared, a law providing for gubernatorial appointment as the means to fill county commission vacancies unless a local law authorized a special election. When the vacancy arose, appellee voters and state legislators (hereinafter Kennedy) filed suit against the Governor in state court, asserting that the 2004 Act had revived the 1985 Act and

2                    RILEY *v.* KENNEDY

Syllabus

cured its infirmity under the Alabama Constitution. Adopting Kennedy's view, the trial court ordered the Governor to call a special election. Before the election took place, however, the Alabama Supreme Court reversed the trial court's order, holding that the 2004 Act did not resurrect the 1985 Act. The Governor therefore filled the vacancy by appointment, naming Commissioner Chastang to the open seat. Kennedy then commenced this suit in Federal District Court. Invoking §5 of the VRA, she sought declaratory relief and an injunction barring the Governor from filling the Commission vacancy by appointment unless and until Alabama gained preclearance of the *Stokes* and *Kennedy* decisions. A three-judge District Court granted the requested declaration in August 2006. It determined that the "baseline" against which any change should be measured was the 1985 Act's provision requiring special elections, a measure both precleared and put into "force or effect" with the special election in 1987. It followed, the District Court reasoned, that the gubernatorial appointment called for by *Stokes* and *Kennedy* ranked as a change from the baseline practice; consequently, those decisions should have been precleared. Deferring affirmative relief, the District Court gave the State 90 days to obtain preclearance. When the DOJ denied the State's request for preclearance, Kennedy returned to the District Court and filed a motion for further relief. On May 1, 2007, the District Court vacated the Governor's appointment of Chastang to the Commission, finding it unlawful under §5 of the VRA. The Governor filed a notice of appeal in the District Court on May 18.

*Held:*

1. Because the District Court did not render its final judgment until May 1, 2007, the Governor's May 18 notice of appeal was timely. Under §5, "any appeal" from the decision of a three-judge district court "shall lie to the Supreme Court," 42 U. S. C. §1973c(a), but the appeal must be filed within 60 days of a district court's entry of a final judgment, see 28 U. S. C. §2101(b). Kennedy maintains that the District Court's August 2006 order qualified as a final judgment, while the Governor maintains that the District Court's final judgment was the May 1 order vacating Chastang's appointment. A final judgment "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin* v. *United States*, 324 U. S. 229, 233. The August 2006 order declared that preclearance was required for the *Stokes* and *Kennedy* decisions, but left unresolved Kennedy's demand for injunctive relief. An order resolving liability without addressing a plaintiff's requests for relief is not final. See *Liberty Mut. Ins. Co.* v. *Wetzel*, 424 U. S. 737, 742–743. Pp. 9–10.

2. For §5 purposes, the 1985 Act never gained "force or effect."

Syllabus

Therefore, Alabama's reinstatement of its prior practice of gubernatorial appointment did not rank as a "change" requiring preclearance. Pp. 10–20.

(a) In order to determine whether an election practice constitutes a "change" as defined in this Court's §5 precedents, the practice must be compared with the covered jurisdiction's "baseline," *i.e.,* the most recent practice both precleared and "in force or effect"—or, absent any change since the jurisdiction's coverage date, the practice "in force or effect" on that date. See *Young* v. *Fordice,* 520 U. S. 273, 282–283. Pp. 10–12.

(b) While not controlling here, three precedents addressing §5's term of art "in force or effect" provide the starting point for the Court's inquiry. In *Perkins* v. *Matthews,* 400 U. S. 379, the question was what practice had been "in force or effect" in Canton, Mississippi, on that State's 1964 coverage date. A 1962 state law required at-large elections for city aldermen, but Canton had elected aldermen by wards in 1961 and again in 1965. This Court held that the city's 1969 attempt to move to at-large elections was a change requiring preclearance because election by ward was "the procedure *in fact* 'in force or effect' in Canton" on the coverage date. *Id.,* at 395. Similarly, in *City of Lockhart* v. *United States,* 460 U. S. 125, the question was what practice had been "in force or effect" in Lockhart, Texas, on the relevant coverage date. The city had used a "numbered-post" system to elect its city council for more than 50 years. Though the numbered-post system's validity under state law was "not entirely clear," *id.,* at 132, "[t]he proper comparison [wa]s between the new system and the system actually in effect on" the coverage date, "regardless of what state law might have required," *ibid.* Finally, in *Young* v. *Fordice,* the question was whether a provisional voter registration plan precleared and implemented by Mississippi election officials, who believed that the state legislature was about to amend the relevant law, had been "in force or effect." See 520 U. S., at 279. As it turned out, the state legislature failed to pass the amendment, and voters who had registered under the provisional plan were required to reregister. This Court held that the provisional plan was a "temporary misapplication of state law" that, for §5 purposes, was "never 'in force or effect.'" *Id.,* at 282. *Young* thus qualified the general rule of *Perkins* and *Lockhart:* A practice best characterized as nothing more than a "temporary misapplication of state law," is *not* in "force or effect," even if actually implemented by state election officials, 520 U. S., at 282. Pp. 12–15.

(c) If the only relevant factors were the length of time a practice was in use and the degree to which it was implemented, this would be a close case under *Perkins, Lockhart,* and *Young.* But an extraor-

4                    RILEY *v.* KENNEDY

Syllabus

dinary circumstance not present in any past case is operative here, impelling the conclusion that the 1985 Act was never "in force or effect": The Act was challenged in state court at first opportunity, the lone election was held in the shadow of that legal challenge, and the Act was ultimately invalidated by the Alabama Supreme Court. These characteristics plainly distinguish this case from *Perkins* and *Lockhart,* where the state judiciary had no involvement. The prompt legal challenge and the State Supreme Court's decision also provide strong cause to conclude that, in the §5 context, the 1985 Act was never "in force or effect." A State's highest court is unquestionably "the ultimate exposito[r] of state law." *Mullaney* v. *Wilbur,* 421 U. S. 684, 691. And because the State Supreme Court's prerogative to say what Alabama law is merits respect in federal forums, a law challenged at first opportunity and invalidated by Alabama's highest court is properly regarded as null and void *ab initio,* incapable of effecting any change in Alabama law or establishing a voting practice under §5. There is no good reason to hold otherwise simply because Alabama's highest court did not render its decision until after an election was held. To the contrary, practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges. Cf. *Purcell* v. *Gonzalez,* 549 U. S. 1, 5–6 *(per curiam).* Ruling otherwise would have the anomalous effect of binding Alabama to an unconstitutional practice because of the state trial court's error. The trial court misconstrued the State's law and, due to that court's error, an election took place. That sequence of events, the District Court held, made the 1985 Act part of Alabama's §5 baseline. In essence, the District Court's decision gave controlling effect to the erroneous trial court ruling and rendered the Alabama Supreme Court's corrections inoperative. That sort of interference with a state supreme court's ability to determine the content of state law is more than a hypothetical concern. The realities of election litigation are such that lower state courts often allow elections to proceed based on erroneous interpretations of state law later corrected on appeal. The Court declines to adopt a rigid interpretation of "in force or effect" that would deny state supreme courts the opportunity to correct similar errors in the future. Pp. 15–19.

(d) Although this Court's reasoning and the facts of this case should make the narrow scope of the holding apparent, some cautionary observations are in order. First, the presence of a judgment by Alabama's highest court invalidating the 1985 Act under the State Constitution is critical here. The outcome might be different were a potentially unlawful practice simply abandoned by state officials after initial use in an election. Cf. *Perkins,* 400 U. S., at 395. Second, the 1985 Act was challenged the first time it was invoked and struck

Cite as: 553 U. S. ____ (2008)          5

Syllabus

down shortly thereafter.  The same result would not necessarily follow if a practice were invalidated only after enforcement without challenge in several previous elections.  Cf. *Young*, 520 U. S., at 283.  Finally, the consequence of the Alabama Supreme Court's *Stokes* decision was to reinstate a practice—gubernatorial appointment—identical to the State's §5 baseline.  Preclearance might well have been required had the court instead ordered the State to adopt a novel practice.  Pp. 19–20.

Reversed and remanded.

  GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined.  STEVENS, J., filed a dissenting opinion, in which SOUTER, J., joined.

Cite as: 553 U. S. ____ (2008)     1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–77

_____

## BOB RILEY, GOVERNOR OF ALABAMA, APPELLANT v. YVONNE KENNEDY ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

[May 27, 2008]

JUSTICE GINSBURG delivered the opinion of the Court.

This case presents a novel question concerning §5 of the Voting Rights Act of 1965. The setting, in a nutshell: A covered State passed a law adopting a new election practice, obtained the preclearance required by §5, and held an election. Soon thereafter, the law under which the election took place was invalidated by the State's highest court on the ground that it violated a controlling provision of the State's Constitution. The question presented: Must the State obtain fresh preclearance in order to reinstate the election practice prevailing before enactment of the law struck down by the State's Supreme Court? We hold that, for §5 purposes, the invalidated law never gained "force or effect." Therefore, the State's reversion to its prior practice did not rank as a "change" requiring preclearance.

I

The Voting Rights Act of 1965 (VRA), 79 Stat. 437, as amended, 42 U. S. C. §1973 *et seq.*, "was designed by Congress to banish the blight of racial discrimination in voting, which ha[d] infected the electoral process in parts

of our country for nearly a century." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308 (1966). In three earlier statutes, passed in 1957, 1960, and 1964, Congress had empowered the Department of Justice (DOJ or Department) to combat voting discrimination through "case-by-case litigation." *Id.*, at 313. These lawsuits, however, made little headway. Voting-rights suits were "unusually onerous to prepare" and the progress of litigation was "exceedingly slow," in no small part due to the obstructionist tactics of state officials. *Id.*, at 314. Moreover, some States "resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *Id.*, at 335.

The VRA reflected Congress' determination that "sterner and more elaborate measures" were needed to counteract these formidable hindrances. *Id.*, at 309. Sections 4 and 5 impose the most stringent of the Act's remedies. Under §4(b), as amended, a State or political subdivision is a so-called "covered jurisdiction" if, on one of three specified coverage dates: (1) it maintained a literacy requirement or other "test or device" as a prerequisite to voting, and (2) fewer than 50% of its voting-age citizens were registered to vote or voted in that year's Presidential election. 42 U. S. C. A. §1973b(b) (Supp. 2007). Section 4(a) suspends the operation of all such "test[s] or device[s]" in covered jurisdictions. §1973b(a) (main ed. and Supp. 2007). Section 5 requires covered jurisdictions to obtain what has come to be known as "preclearance" from the District Court for the District of Columbia or the DOJ before "enact[ing] or seek[ing] to administer" any alteration of their practices or procedures affecting voting. §1973c(a) (Supp. 2007).

A change will be precleared only if it "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [because of

Opinion of the Court

membership in a language minority group]." *Ibid.* An election practice has the "effect" of "denying or abridging the right to vote" if it "lead[s] to a retrogression in the position of racial [or language] minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U. S. 130, 141 (1976). See also *Young* v. *Fordice*, 520 U. S. 273, 276 (1997); 28 CFR §51.54 (2007). As amended in 2006, the statute defines "purpose" to include "any discriminatory purpose." 120 Stat. 581, codified at 42 U. S. C. A. §1973c(c) (Supp. 2007).

Congress took the extraordinary step of requiring covered jurisdictions to preclear all changes in their voting practices because it "feared that the mere suspension of existing tests [in §4(a)] would not completely solve the problem, given the history some States had of simply enacting new and slightly different requirements with the same discriminatory effect." *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 548 (1969). By putting the burden on covered jurisdictions to demonstrate that future changes would not be discriminatory, §5 served to "shift the advantage of time and inertia from the perpetrators of the evil to its victims." *Katzenbach*, 383 U. S., at 328.

Sections 4 and 5 were originally scheduled to lapse once a covered jurisdiction complied with §4(a)'s ban on the use of tests and devices for five years. See 79 Stat. 438. Finding continuing discrimination in access to the ballot, however, Congress renewed and expanded §§4 and 5 on four occasions, most recently in 2006.[1] Sections 4 and 5 are now set to expire in 2021, see 42 U. S. C. A. §1973b(a)(8) (Supp. 2007), but a covered jurisdiction may "bail out" at any time if it satisfies certain requirements, see

————————

[1] See Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, 120 Stat. 577; Voting Rights Act Amendments of 1982, 96 Stat. 131; Voting Rights Act Amendments of 1975, 89 Stat. 400; Voting Rights Act Amendments of 1970, 84 Stat. 314.

§1973b(a)(1) (main ed. and Supp. 2007).

## II

The voting practice at issue in this litigation is the method used to fill midterm vacancies on the Mobile County Commission, the governing body of Mobile County, Alabama. Composed of three members elected by separate districts to four-year terms, the Commission has the power to levy taxes, make appropriations, and exercise other county-wide executive and administrative functions. See Ala. Code §11–3–11 (1975).

We set out first, as pivotal to our resolution of this case, a full account of two disputes over the means of filling midterm vacancies on the Commission. The first occurred between 1985 and 1988; the second began in 2004 and culminates in the appeal now before us.

## A

Alabama is a covered jurisdiction with a coverage date of November 1, 1964. See 30 Fed. Reg. 9897 (1965). As of that date, Alabama law provided that midterm vacancies on all county commissions were to be filled by gubernatorial appointment. See Ala. Code §12–6 (1959). The relevant provision was later recodified without substantive change as Ala. Code §11–3–6 (1975), which stated:

"In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed."

In 1985, however, the state legislature passed a "local law" providing that any vacancy on the Mobile County Commission occurring "with twelve months or more remaining on the term of the vacant seat" would be filled by special election rather than gubernatorial appointment. 1985

Opinion of the Court

Ala. Acts no. 85–237 (1985 Act).[2] The DOJ precleared this new law in June 1985.

The first midterm opening on the Commission postpassage of the 1985 Act occurred in 1987, when the seat for District One—a majority African-American district—became vacant. In accord with the 1985 Act, the Governor called a special election. A Mobile County voter, Willie Stokes, promptly filed suit in state court seeking to enjoin the election. The 1985 Act, he alleged, violated Art. IV, §105, of the Alabama Constitution, which provides that no "local law . . . shall be enacted in any case which is provided for by a general law." On Stokes's reading, the 1985 Act conflicted with §105 because the Act addressed a matter already governed by Ala. Code §11–3–6.

The state trial court rejected Stokes's argument and entered judgment for the state defendants. Stokes immediately appealed to the Alabama Supreme Court and sought an order staying the election pending that court's decision. The requested stay was denied and the special election went forward in June 1987. The winner, Samuel Jones, took office as District One's Commissioner in July 1987. Approximately 14 months later, however, in September 1988, the Alabama Supreme Court reversed the trial court's judgment. Finding that the 1985 Act "clearly offend[ed] §105 of the [Alabama] Constitution," the court declared the Act unconstitutional. *Stokes* v. *Noonan*, 534 So. 2d 237, 238–239 (1988).

The Alabama Supreme Court's decree cast grave doubt

_____

[2] Under the Alabama Constitution, a "general" law is "a law which in its terms and effect applies either to the whole state, or to one or more municipalities of the state less than the whole in a class." Art. IV, §110. A "special or private" law is a law that "applies to an individual, association or corporation." *Ibid.* A "local" law is "a law which is not a general law or a special or private law." *Ibid.* The 1985 Act was a local law because it applied only to Mobile County; the remainder of the State continued to be governed by Ala. Code §11–3–6 (1975).

on the legitimacy of Jones's election and, consequently, on his continued tenure in office. The Governor, however, defused any potential controversy by immediately invoking his authority under Ala. Code §11–3–6 and appointing Jones to the Commission.

### B

The next midterm vacancy on the Commission did not occur until October 2005, when Jones—who had been reelected every four years since 1988—was elected mayor of the city of Mobile. Once again, the method of filling the vacancy became the subject of litigation. In 2004, the state legislature had passed (and the DOJ had precleared) an amendment to Ala. Code §11–3–6 providing that vacancies on county commissions were to be filled by gubernatorial appointment "[u]nless a local law authorizes a special election." 2004 Ala. Acts no. 2004–455 (2004 Act). When the 2005 vacancy arose, three Mobile County voters and Alabama state legislators—appellees Yvonne Kennedy, James Buskey, and William Clark (hereinafter Kennedy)—filed suit against Alabama's Governor, Bob Riley, in state court. The 2004 Act's authorization of local laws providing for special elections, they urged, had revived the 1985 Act and cured its infirmity under §105 of the Alabama Constitution. Adopting Kennedy's view, the state trial court ordered Governor Riley to call a special election.

While the Governor's appeal to the Alabama Supreme Court was pending, Mobile County's election officials obtained preclearance of procedures for a special election, scheduled to take place in January 2006. In November 2005, however, the Alabama Supreme Court reversed the trial court's order. Holding that the 2004 Act "provide[d] for prospective application only" and thus did not resurrect the 1985 Act, Alabama's highest court ruled that "Governor Riley [wa]s authorized to fill the vacancy on the

Opinion of the Court

Mobile County Commission by appointment." *Riley* v. *Kennedy*, 928 So. 2d 1013, 1017 (2005). Governor Riley promptly exercised that authority by appointing Juan Chastang.

The day after the Alabama Supreme Court denied rehearing, Kennedy commenced the instant suit in Federal District Court. Invoking §5, she sought declaratory relief and an injunction barring Governor Riley from filling the Commission vacancy by appointment unless and until Alabama gained preclearance of the decisions in *Stokes* and *Kennedy*. As required by §5, a three-judge District Court convened to hear the suit. See 42 U. S. C. A. §1973c(a) (Supp. 2007); *Allen*, 393 U. S., at 563.

In August 2006, the three-judge court, after a hearing, granted the requested declaration. The court observed first that for purposes of §5's preclearance requirement, "[c]hanges are measured by comparing the new challenged practice with the baseline practice, that is, the most recent practice that is both precleared and in force or effect." 445 F. Supp. 2d 1333, 1336 (MD Ala.). It then determined that the 1985 Act's provision requiring special elections had been both precleared and put into "force or effect" with the special election of Jones in 1987. It followed, the District Court reasoned, that the gubernatorial appointment called for by *Stokes* and *Kennedy* ranked as a change from the baseline practice; consequently "the two [Alabama Supreme Court] decisions . . . should have been precleared before they were implemented." 445 F. Supp. 2d, at 1336.

Deferring affirmative relief, the District Court gave the State 90 days to obtain preclearance of *Stokes* and *Kennedy*. 445 F. Supp 2d, at 1336. Without conceding that preclearance was required, the State submitted the decisions to the DOJ. Finding that the State had failed to prove that the reinstatement of gubernatorial appointment would not be retrogressive, the Department denied preclearance. See App. to Motion to Dismiss or Affirm 2a–

8                    RILEY *v.* KENNEDY

Opinion of the Court

8a.  "The African-American voters of District 1," the DOJ
explained, "enjoy the opportunity to elect minority candi-
dates of their choice" under the 1985 Act.  *Id.*, at 6a.  A
change to gubernatorial appointment would be retrogres-
sive because it "would transfer this electoral power to a
state official elected by a statewide constituency whose
racial make-up and electoral choices regularly differ from
those of the voters of District 1."  *Ibid.*

  After the State unsuccessfully sought DOJ reconsidera-
tion, Kennedy returned to the District Court and filed a
motion for further relief.  On May 1, 2007, the District
Court ruled that "Governor Bob Riley's appointment of
Juan Chastang to the Mobile County Commission . . . was
unlawful under federal law" and vacated the appointment.
App. to Juris. Statement 1a–2a.  Governor Riley filed a
notice of appeal in the District Court on May 18, 2007, and
a Jurisdictional Statement in this Court on July 17, 2007.
In November 2007, we postponed a determination of juris-
diction until our consideration of the case on the merits.
552 U. S. ___.

  In the meantime, a special election was held in Mobile
County in October 2007 to fill the vacancy resulting from
the District Court's order vacating Chastang's appoint-
ment.[3]  Chastang ran in the election but was defeated by
Merceria Ludgood, who garnered nearly 80% of the vote.
See Certification of Results, Special Election, Mobile
County (Oct. 16, 2007), http://records.mobile-county.net/
ViewImagesPDFAll.Aspx?ID=2007081288 (as visited May
22, 2008, and available in Clerk of Court's case file).
Ludgood continues to occupy the District One seat on the
Commission.  Her term will expire in November 2008.[4]

—————

  [3]The District Court denied the Governor's motion to stay its judg-
ment pending this appeal.  See App. 7.
  [4]Regardless of the outcome of this litigation, the method for filling
future midterm vacancies on the Commission appears to have been
settled.  In 2006, the Alabama Legislature enacted a new measure

Opinion of the Court

## III

Before reaching the merits of Governor Riley's appeal, we first take up Kennedy's threshold objection. The appeal, Kennedy urges, must be dismissed as untimely.

Section 5 provides that "any appeal" from the decision of a three-judge district court "shall lie to the Supreme Court." 42 U. S. C. §1973c(a). Such an appeal must be filed within 60 days of the District Court's entry of a final judgment. See 28 U. S. C. §2101(b). Kennedy maintains that Governor Riley's May 18, 2007 notice of appeal came too late because the District Court's August 2006 order qualified as a final judgment. If Kennedy's characterization is correct, then Governor Riley's time to file an appeal expired in October 2006 and his appeal must be dismissed. But if, as Governor Riley maintains, the District Court did not issue a final judgment until the order vacating Chastang's appointment on May 1, 2007, then the Governor filed his appeal well within the required time.

A final judgment is "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin* v. *United States*, 324 U. S. 229, 233 (1945).[5] The District Court's August 2006 order declared that the Alabama Supreme Court's decisions in *Stokes* and *Kennedy* required preclearance, but that order left unre-

_____

providing that, on a going-forward basis, vacancies on the Commission will be filled by special election. See 2006 Ala. Acts no. 2006–342. The DOJ precleared the statute in July 2007. The passage of this law does not render this case moot: If the Governor prevails in his appeal, Chastang may seek reinstatement to the Commission to serve out the remainder of the term ending in November 2008. See Brief for United States as *Amicus Curiae* 5, n. 1.

[5] *Catlin* and the other authorities cited in this Part interpret the meaning of "final decisions" in 28 U. S. C. §1291, the statute governing appeals from district courts to the courts of appeals. We find them instructive in interpreting the parallel term "final" judgment in §2101(b).

solved Kennedy's demand for injunctive relief. We have long held that an order resolving liability without addressing a plaintiff's requests for relief is not final. See *Liberty Mut. Ins. Co.* v. *Wetzel*, 424 U. S. 737, 742–743 (1976). See also 15B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3915.2, p. 271 (2d ed. 1992).

Resisting the conclusion these authorities indicate, Kennedy maintains that the August 2006 order ranked as a final decision for two reasons. First, she contends, that order conclusively settled the key remedial issue, for it directed Governor Riley to seek preclearance of the Alabama Supreme Court's decisions in *Stokes* and *Kennedy*. See Brief for Appellees 26–27. This argument misapprehends the District Court's order: Far from requiring the Governor to seek preclearance, the District Court expressly allowed for the possibility that he would elect not to do so. See 445 F. Supp. 2d, at 1337 ("Defendant Riley is to keep the court informed of what action, *if any*, the State decides to take . . . ." (emphasis added)). Second, Kennedy notes that the District Court directed entry of its August 2006 order "as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure," *ibid.* See Brief for Appellees 27. "The label used by the District Court," however, "cannot control [an] order's appealability." *Sullivan* v. *Finkelstein*, 496 U. S. 617, 628, n. 7 (1990). See also *Wetzel*, 424 U. S., at 741–743.

Because the District Court did not render its final judgment until May 1, 2007, Governor Riley's May 18 notice of appeal was timely. We therefore proceed to the merits.

IV

Prior to 1985, Alabama filled midterm vacancies on the Mobile County Commission by gubernatorial appointment. The 1985 Act adopted a different practice—special elections. That new practice was used in one election only, held in 1987. The next year, the Alabama Supreme Court

Opinion of the Court

determined, in *Stokes* v. *Noonan*, that the Act authorizing special elections was invalid under the State's Constitution.  Properly framed, the issue before us is whether §5 required Alabama to obtain preclearance before reinstating the practice of gubernatorial appointment in the wake of the decision by its highest court invalidating the special-election law.[6]

It is undisputed that a "change" from election to appointment is a change "with respect to voting" and thus covered by §5.  See *Allen*, 393 U. S., at 569–570; *Presley* v. *Etowah County Comm'n*, 502 U. S. 491, 502–503 (1992).  We have also stated that the preclearance requirement encompasses "voting changes mandated by order of a state court."  *Branch* v. *Smith*, 538 U. S. 254, 262 (2003).  See also *Hathorn* v. *Lovorn*, 457 U. S. 255, 265–266, and n. 16 (1982).  The question is whether, given the circumstances here presented, any "change" within the meaning of §5 occurred in this case.

In order to determine whether an election practice constitutes a "change" as that term is defined in our §5 precedents, we compare the practice with the covered

_____

[6]As framed by the District Court, the issue was whether the Alabama Supreme Court's decisions in *Stokes* v. *Noonan* and *Riley* v. *Kennedy* should have been precleared.  See 445 F. Supp. 2d, at 1336.  This formulation, we conclude, misstates the issue in two technical respects.  First, §5 requires a covered jurisdiction to seek preclearance of any changed "practice . . . with respect to voting."  42 U. S. C. A. §1973c(a) (Supp. 2007).  The "practice" at issue here is gubernatorial appointment.  That practice, and not the Alabama Supreme Court's interpretation of state law in *Stokes* and *Kennedy*, is the proper subject of the §5 inquiry.  Second, as Governor Riley noted, see Brief for Appellant 25, if there was a change requiring preclearance, it came about as a result of *Stokes*, not *Kennedy*.  *Stokes* held that the 1985 Act violated the Alabama Constitution, and the State accordingly reinstated the practice of gubernatorial appointment with the Governor's 1988 appointment of Jones.  *Kennedy* simply determined that the 2004 Act did not resurrect the 1985 Act; that decision itself prompted no change in the State's election practices.

Opinion of the Court

jurisdiction's "baseline."  We have defined the baseline as
the most recent practice that was both precleared and "in
force or effect"—or, absent any change since the jurisdic-
tion's coverage date, the practice that was "in force or
effect" on that date.  See *Young*, 520 U. S., at 282–283.
See also *Presley*, 502 U. S., at 495.   The question is
"whether a State has 'enact[ed]' or is 'seek[ing] to adminis-
ter' a 'practice or procedure' that is 'different' enough"
from the baseline to qualify as a change.  *Young*, 520 U. S.,
at 281 (quoting 42 U. S. C. §1973c).[7]

For the reasons that follow, we conclude that the 1985
Act was never "in force or effect" within the meaning of §5.
At all relevant times, therefore, the baseline practice for
filling midterm vacancies on the Commission was the pre-
1985 practice of gubernatorial appointment.   The State's
reinstatement of that practice thus did not constitute a
change requiring preclearance.

A

We have directly addressed the §5 term of art "in force
or effect" on three prior occasions.  As will become clear,
these precedents do not control this case because they

_____

[7]By its terms, §5 requires preclearance of any election practice that is
"different from that in force or effect on" the relevant coverage date—in
this case, November 1, 1964.   42 U. S. C. A. §1973c(a) (Supp. 2007).
Governor Riley's opening brief suggested that this text could be read to
mean that no preclearance is required if a covered jurisdiction seeks to
adopt the *same* practice that is in force or effect on its coverage
date—even if, because of intervening changes, that practice is different
from the jurisdiction's baseline.   See Brief for Appellant 26–27.   In
response, Kennedy and the United States noted that the DOJ, see 28
CFR §51.12 (2007), and the lower courts to consider the question, see,
*e.g., NAACP, DeKalb Cty. Chapter* v. *Georgia*, 494 F. Supp. 668, 677
(ND Ga. 1980) (three-judge court), have rejected this interpretation.
See Brief for Appellees 47–49; Brief for United States as *Amicus Curiae*
17–18.  We need not resolve this dispute because the result in this case
is the same under either view.  But see *post*, at 2–3 (taking the issue
up, although it is academic here).

Opinion of the Court

differ in a critical respect. They do, however, provide the starting point for our inquiry.

In *Perkins* v. *Matthews*, 400 U. S. 379 (1971), the question was what practice had been "in force or effect" in the city of Canton, Mississippi, on that State's §5 coverage date, November 1, 1964. A 1962 state law required selection of city aldermen by at-large elections rather than by ward. Canton, however, "ignored the mandate [of the statute] in the conduct of the 1965 municipal elections and, as in 1961, elected aldermen by wards." *Id.*, at 394. In the 1969 election, the city sought to switch to at-large elections. We held that this move was a change requiring preclearance because election by ward was "the procedure *in fact* 'in force or effect' in Canton on November 1, 1964." *Id.*, at 395.

We endeavored to determine in *Perkins* the voting procedure that would have been followed on the coverage date, November 1, 1964. Two choices were apparent: the state law on the books since 1962 calling for at-large elections, or the practice Canton actually used, *without challenge*, in 1965—election by wards. We picked the 1965 practice as the more likely indicator of the practice Canton would have employed had it held an election on the coverage date, just seven months earlier. See *id.*, at 394–395.

Similarly, in *City of Lockhart* v. *United States*, 460 U. S. 125 (1983), the question was what practice had been "in force or effect" in Lockhart, Texas, on the relevant §5 coverage date, November 1, 1972. For more than 50 years, without challenge, the city had used a "numbered-post" system to elect its city council. See *id.*, at 132, n. 6.[8] A

---

[8]Under the "numbered post" system, "the two commissioner posts were designated by number, and each candidate for commissioner specified the post for which he or she sought election." *City of Lockhart* v. *United States*, 460 U. S. 125, 127 (1983) (internal quotation marks omitted). It contrasted with an alternative system "in which all of the candidates . . . run in a single election, and the two receiving the

14                    RILEY *v.* KENNEDY

Opinion of the Court

group of plaintiffs nonetheless contended that the numbered-post system was never "in force or effect" because it
lacked state-law authorization. We noted that the validity
of the numbered-post system under state law was "not
entirely clear." *Id.*, at 132.[9] Relying on *Perkins*, we considered the uncertain state of Texas law "irrelevant," for
"[t]he proper comparison [wa]s between the new system
and the system actually in effect on November 1, 1972,
regardless of what state law might have required." 460
U. S., at 132 (footnote omitted).

Finally, in *Young* v. *Fordice*, decided in 1997, the question was whether a provisional voter registration plan
implemented by Mississippi election officials had been "in
force or effect." Believing that the state legislature was
about to amend the relevant law, the officials had prepared and obtained preclearance for a new voter registration scheme. See 520 U. S., at 279. Roughly one-third of
the State's election officials implemented the plan, registering around 4,000 voters. See *id.*, at 278, 283. As it
turned out, however, the state legislature failed to pass
the amendment, and the voters who had registered under
the provisional plan were required to reregister. See *id.*,
at 278. When the case reached us, we rejected the argument that "the [p]rovisional [p]lan, because it was precleared by the Attorney General, became part of the baseline against which to judge whether a future change must
be precleared." *Id.*, at 282. Regarding the provisional
plan as a "temporary misapplication of state law," we held
that, for §5 purposes, the plan was "never 'in force or
effect.'" *Ibid.* We emphasized that the officials who implemented the provisional plan "did not intend to adminis-

_____

greatest number of votes are elected." *Id.*, at 127, n. 1.

[9]We commented in this regard that the longevity of the numbered-
post system "suggest[ed] a presumption of legality under state law."
*Id.*, at 132, n. 6.

Opinion of the Court

ter an unlawful plan" and that they abandoned it "as soon
as its unlawfulness became apparent." *Id.*, at 283. We
also noted that the provisional plan had been used for only
41 days and that the State "held no elections" during that
period. *Ibid.*

### B

*Perkins* and *Lockhart* established that an election prac-
tice may be "in force or effect" for §5 purposes despite its
illegality under state law if, as a practical matter, it was
"actually in effect." *Lockhart*, 460 U. S., at 132. Our more
recent decision in *Young*, however, qualified that general
rule: A practice best characterized as nothing more than a
"temporary misapplication of state law," we held, is *not* in
"force or effect," even if actually implemented by state
election officials. 520 U. S., at 282.

If the only relevant factors were the length of time a
practice was in use and the extent to which it was imple-
mented, this would be a close case falling somewhere
between the two poles established by our prior decisions.
On one hand, as in *Young*, the 1985 Act was a "temporary
misapplication" of state law: It was on the books for just
over three years and applied as a voting practice only
once. In *Lockhart*, by contrast, the city had used the
numbered-post system "for over 50 years without chal-
lenge." 460 U. S., at 132, n. 6. (*Perkins* is a less clear
case: The city failed to alter its practice in response to
changed state law for roughly seven years, but only a
single election was held during that period. See 400 U. S.,
at 394.) On the other hand, in *Young* no election occurred
during the time the provisional registration plan was in
use, while in this case one election *was* held under the
later-invalidated 1985 Act.

We are convinced, however, that an extraordinary cir-
cumstance not present in any past case is operative here,
impelling the conclusion that the 1985 Act was never "in

Opinion of the Court

force or effect": The Act was challenged in state court at first opportunity, the lone election was held in the shadow of that legal challenge, and the Act was ultimately invalidated by the Alabama Supreme Court.

These characteristics plainly distinguish the present case from *Perkins* and *Lockhart.* The state judiciary had no involvement in either of those cases, as the practices at issue were administered without legal challenge of any kind. And in *Lockhart,* we justified our unwillingness to incorporate a practice's legality under state law into the §5 "force or effect" inquiry in part on this ground: "We doubt[ed] that Congress intended" to require "the Attorney General and the District Court for the District of Columbia" to engage in "speculation as to state law." 460 U. S., at 133, n. 8. Here, in contrast, the 1985 Act's invalidity under the Alabama Constitution has been definitively established by the Alabama Supreme Court.

The prompt legal challenge and the Alabama Supreme Court's decision not only distinguish this case from *Perkins* and *Lockhart;* they also provide strong cause to conclude that, in the context of §5, the 1985 Act was never "in force or effect." A State's highest court is unquestionably "the ultimate exposito[r] of state law." *Mullaney* v. *Wilbur,* 421 U. S. 684, 691 (1975). And because the prerogative of the Alabama Supreme Court to say what Alabama law is merits respect in federal forums,[10] a law challenged at first opportunity and invalidated by Alabama's highest court is properly regarded as null and void *ab initio,* incapable of effecting any change in Alabama law or establishing a voting practice for §5 purposes. Indeed, Kennedy and the United States appear to concede

----

[10]The dissent observes that the Alabama Supreme Court's decision in *Stokes* was not unanimous. See *post,* at 8–9. Like this Court, the Alabama Supreme Court does not shy away from revealing dissenting opinions. Of course, it is the majority opinion that declares what state law is.

Opinion of the Court

that the 1985 Act would not have been "in force or effect" had the Alabama Supreme Court stayed the 1987 election pending its decision in *Stokes* (or simply issued its decision sooner). See Brief for Appellees 51; Brief for United States as *Amicus Curiae* 23–24.

There is no good reason to hold otherwise simply because Alabama's highest court, proceeding at a pace hardly uncommon in litigated controversies, did not render its decision until after an election was held. In this regard, we have recognized that practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges. Cf. *Purcell* v. *Gonzalez*, 549 U. S. 1, 5–6 (2006) *(per curiam)* ("Given the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction suspending the [challenged] rules.").

Ruling as Kennedy and the United States urge, moreover, would have the anomalous effect of binding Alabama to an unconstitutional practice because of a state trial court's error. If the trial court had gotten the law of Alabama right, all agree, there would have been no special election and no tenable argument that the 1985 Act had ever gained "force or effect." But the trial court misconstrued the State's law and, due to that court's error, an election took place. That sequence of events, the District Court held, made the Act part of Alabama's §5 baseline. No precedent of this Court calls for such a holding.

The District Court took care to note that its decision "d[id] not in any way undermine *[Stokes* and *Kennedy]* under state law." 445 F. Supp. 2d, at 1337. In some theoretical sense, that may be true. Practically, however, the District Court's decision gave controlling effect to the erroneous trial court decision and rendered the Alabama Supreme Court's corrections inoperative. Alabama's Constitution, that State's Supreme Court determined,

18                         RILEY *v.* KENNEDY

Opinion of the Court

required that, in the years here involved, vacancies on the
Mobile County Commission be filled by appointment
rather than special election.   Nothing inherent in the
practice of appointment violates the Fifteenth Amendment
or the VRA.   The DOJ, however, found that a *change* from
special elections to appointment had occurred in District
One, and further found that the change was retrogressive,
hence barred by §5.   The District Court's final decision,
tied to the DOJ determination, thus effectively precluded
the State from reinstating gubernatorial appointment, the
only practice consistent with the Alabama Constitution
pre-2006.[11]   Indeed, Kennedy's counsel forthrightly ac-
knowledged that the position she defends would "loc[k]
into place" an unconstitutional practice.   Tr. of Oral Arg.
32.

The dissent, too, appears to concede that its reading of
§5 would bind Alabama to an unconstitutional practice
because of an error by the state trial court.   See *post*, at 7.
But it contends that this imposition is no more "offensive
to state sovereignty" than "effectively requiring a State to
administer a law it has repealed," *post*, at 8—a routine
consequence of §5.   The result described by the dissent,
however, follows directly from the Constitution's instruc-
tion that a state law may not be enforced if it conflicts
with federal law.   See Art. VI, cl. 2.   Section 5 prohibits
States from making retrogressive changes to their voting
practices, and thus renders any such changes unenforce-
able.   To be sure, this result constrains States' legislative
freedom.   But the rule advocated by the dissent would
effectively preclude Alabama's highest court from applying
to a state law a provision of the State Constitution entirely
harmonious with federal law.   That sort of interference

───────────

[11] As earlier noted, see *supra*, at 8–9, n. 4, the Alabama Legislature
modified the relevant state law in 2006 by adopting special elections on
a going-forward basis.

Opinion of the Court

with a state supreme court's ability to determine the content of state law, we think it plain, is a burden of a different order.

This burden is more than a hypothetical concern. The realities of election litigation are such that lower state courts often allow elections to proceed based on erroneous interpretations of state law later corrected on appeal. See, *e.g., Akins* v. *Secretary of State*, 154 N. H. 67, 67–68, 74, 904 A. 2d 702, 703, 708 (2006) (preelection challenge rejected by a state trial court but eventually sustained in a postelection decision by the State Supreme Court); *Cobb* v. *State Canvassing Bd.*, 2006–NMSC–034, ¶¶1–17, 140 N. M. 77, 79–83 (2006) (same); *Maryland Green Party* v. *Maryland Bd. of Elections*, 377 Md. 127, 137–139, 832 A. 2d 214, 220–221 (2003) (same); *O'Callaghan* v. *State*, 914 P. 2d 1250, 1263–1264 (Alaska 1996) (same); *Peloza* v. *Freas*, 871 P. 2d 687, 688, 692 (Alaska 1994) (same). We decline to adopt a rigid interpretation of "in force or effect" that would deny state supreme courts the opportunity to correct similar errors in the future.

### C

Although our reasoning and the particular facts of this case should make the narrow scope of our holding apparent, we conclude with some cautionary observations. First, the presence of a judgment by Alabama's highest court declaring the 1985 Act invalid under the State Constitution is critical to our decision.[12] We do not suggest the outcome would be the same if a potentially unlawful practice had simply been abandoned by state officials after initial use in an election. Cf. *Perkins*, 400 U. S., at 395. Second, the 1985 Act was challenged the first time it was invoked and struck down shortly thereafter. The same

───────────

[12]There is no indication in the record that the Alabama Supreme Court's decisions in *Stokes* and *Kennedy* were anything other than reasonable and impartial interpretations of controlling Alabama law.

20                    RILEY *v.* KENNEDY

Opinion of the Court

result would not necessarily follow if a practice were invalidated only after enforcement without challenge in several previous elections.  Cf. *Young*, 520 U. S., at 283 ("[T]he simple fact that a voting practice is unlawful under state law does not show, entirely by itself, that the practice was never 'in force or effect.' . . . A State, after all, might maintain in effect for many years a plan that technically . . . violated some provision of state law.").  Finally, the consequence of the Alabama Supreme Court's decision in *Stokes* was to reinstate a practice—gubernatorial appointment—identical to the State's §5 baseline.  Preclearance might well have been required had the court instead ordered the State to adopt a novel practice.[13]

\*     \*     \*

For the reasons stated, the judgment of the United States District Court for the Middle District of Alabama is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[13] In view of these limitations, the concern expressed in Part IV of the dissent, see *post*, at 9–13, is misplaced.  The Alabama Supreme Court's historical role in administering the State's discriminatory literacy test, the dissent contends, "indicates that state courts must be treated on the same terms as state legislatures for §5 purposes," *post*, at 9.  But it is common ground that a "change" made pursuant to a state-court order is subject to §5 scrutiny; the only question is whether the Alabama Supreme Court's ruling in *Stokes* triggered a "change" within the meaning of our decisions.  See *supra*, at 11; *post*, at 8.  More importantly, none of the past discriminatory actions by the state court identified in the dissent would have been sheltered from §5 review by our tightly bounded decision in this case.

Cite as: 553 U. S. ____ (2008)           1

STEVENS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 07–77

————————

## BOB RILEY, GOVERNOR OF ALABAMA, APPELLANT
*v.* YVONNE KENNEDY ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

[May 27, 2008]

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, dissenting.

Voting practices in Alabama today are vastly different from those that prevailed prior to the enactment of the Voting Rights Act of 1965 (VRA), 79 Stat. 437, as amended, 42 U. S. C. §1973 *et seq.* (2000 ed. and Supp. V). Even though many of those changes are, at least in part, the consequence of vigorous and sustained enforcement of the VRA, it may well be true that today the statute is maintaining strict federal controls that are not as necessary or appropriate as they once were. The principal events at issue in this case occurred in the 1980's, when the State's transition from a blatantly discriminatory regime was well underway.

Nevertheless, since Congress recently decided to renew the VRA,[1] and our task is to interpret that statute, we must give the VRA the same generous interpretation that our cases have consistently endorsed throughout its history. In my judgment, the Court's decision today is not faithful to those cases or to Congress' intent to give §5 of the VRA, §1973c (2000 ed.), the "broadest possible scope,"

————————

[1] Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, 120 Stat. 577. The Act passed the Senate by a vote of 98 to 0. 152 Cong. Rec. S8012 (July 20, 2006).

STEVENS, J., dissenting

reaching "any state enactment which altered the election law of a covered State in even a minor way." *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 566–567 (1969). I think it clear, as the Department of Justice argues and the three-judge District Court held, 445 F. Supp. 2d 1333 (MD Ala. 2006), that the Alabama Supreme Court's decision in *Stokes* v. *Noonan*, 534 So. 2d 237 (1988), caused a change in voting practice that required preclearance.

I

Section 5 preclearance is required "[w]henever a [covered] State . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." 42 U. S. C. §1973c. The critical question in this case is whether the procedure for selecting Mobile County Commissioners arising out of *Stokes*—gubernatorial appointment—is a "change" under §5.

As an initial matter, the language of §5 requires that the practice be "different from that in force or effect on November 1, 1964." It is undisputed that the practice in force or effect in 1964 was gubernatorial appointment, see Ala. Code §12–6 (1959); the practice of calling a special election to fill midterm openings on the Mobile County Commission was not introduced until the passage of Alabama Act No. 85–237 (1985 Act), 1985 Ala. Acts no. 85–237.

The argument that a return to gubernatorial appointment will never require preclearance under §5 because gubernatorial appointment was the practice in effect in 1964 is neither persuasive nor properly before the Court. Appellant expressly abandoned any such argument in his briefs to this Court. See Reply Brief 8 ("Our contention, as we have already said, is not that the Court needs to rethink prior dicta suggesting that, despite its language, §5

Stevens, J., dissenting

operates like a ratchet to subsume newly-precleared practices . . . . That question is not before the Court, and we take no position on it"). Further, appellant did not raise the argument in either of his trial briefs to the District Court. Governor's Trial Brief in *Kennedy* v. *Riley,* Civ. Action No. 2:05 CV 1100–T (MD Ala.); Governor's Supplemental Trial Brief in *Kennedy* v. *Riley,* Civ. Action No. 2:05 CV 1100–T (MD Ala.).

Appellant's decision not to challenge the preclearance requirement on this ground was no doubt because of the settled law to the contrary. Reflecting the fact that Congress certainly did not intend §5 to create a "safe harbor" for voting practices identical to practices in effect in 1964, the settled understanding among lower courts and the Department of Justice is that §5 operates instead as a ratchet, freezing in place the most recent voting practice. See Brief for United States as *Amicus Curiae* 16–18 (collecting cases); 28 CFR §51.12 (2007). Furthermore, Congress has reauthorized the VRA in the face of this understanding without amending the relevant language of §5. See Voting Rights Act Reauthorization and Amendments Act of 2006, 120 Stat. 577; *ante,* at 3, n. 1 (describing the history of renewals and extensions of the VRA). Thus, the inclusion of the date 1964 in the language of §5 poses no obstacle to my conclusion that *Stokes*—even though it returned to gubernatorial practice—implemented a change in voting practice that required preclearance.

## II

Whether a voting practice represents a change that requires preclearance is measured against the previously precleared "baseline" practice in force or effect. *Young* v. *Fordice,* 520 U. S. 273, 282–283 (1997); *Presley* v. *Etowah County Comm'n,* 502 U. S. 491, 495 (1992). The baseline is the practice actually in effect immediately prior to the putative change, whether or not that practice violates

STEVENS, J., dissenting

state law. In *Perkins* v. *Matthews*, 400 U. S. 379 (1971), for example, we held that the baseline practice was *not* at-large elections, even though at-large elections were required by a 1962 state statute. Because the city had never implemented that statute, we held that the practice actually in force or effect on November 1, 1964 was ward elections, despite that practice's illegality under state law. *Id.*, at 394–395.

The situation was similar in *City of Lockhart* v. *United States*, 460 U. S. 125 (1983). There we considered whether the practice of using numbered posts for elections was in force on the relevant coverage date and concluded that despite the possibility that this practice was illegal under Texas law, the numbered-post system could serve as the baseline. *Id.*, at 132, and n. 6. We emphasized once again that "[s]ection 5 was intended to halt actual retrogression in minority voting strength without regard for the legality under state law of the practices already in effect." *Id.*, at 133.

In *Young* v. *Fordice*, 520 U. S. 273 (1997), our most recent case deciding whether a voting practice was a baseline under §5, we concluded that the registration procedure at issue was not "in force or effect" and therefore could not serve as the §5 baseline. In 1994, Mississippi began modifying its registration practices in an attempt to comply with the National Voter Registration Act of 1993, 107 Stat. 77, 42 U. S. C. §1973gg *et seq.* (2000 ed. and Supp. V). In late 1994, the Mississippi Secretary of State proposed a series of changes and assumed that the Mississippi Legislature would adopt those changes. The Secretary of State told at least one election official to begin registering voters under the new plan. The proposed changes were precleared, and about 4,000 voters were registered. The legislature failed to adopt the proposal, however, and the registrants were notified that they were not, as they had thought, registered to vote in state

STEVENS, J., dissenting

or local elections. *Fordice*, 520 U. S., at 277–278. We held that the provisional registration system was not the baseline because it was never in force or effect.

An ordinary observer asked to describe voting practice in Alabama with respect to the method of filling vacancies on the Mobile County Commission would no doubt state that before 1985 the practice was gubernatorial appointment, between 1985 and 1988 the practice was special election, and beginning in 1988 the practice changed to gubernatorial appointment.

In the face of this history, the Court comes to the startling conclusion that for purposes of the VRA Alabama has never ceased to practice gubernatorial appointment as its method of selecting members of the Mobile County Commission. But under our case law interpreting §5, it is clear that a change occurred in 1988 when *Stokes* returned Alabama to gubernatorial appointment.[2] This represented a change because the relevant baseline was the special election procedure mandated by the Alabama Legislature's enactment of the 1985 Act, which was precleared by the Department of Justice in June 1985. Pursuant to that law, the Governor called a special election when a vacancy arose in 1987. The vacancy was filled and the newly elected commissioner took office in July 1987 serving, by way of his election, until September 1988.

It is difficult to say that the special election practice was never "in force or effect" with a straight face. Jones was elected and sat on the three-member Mobile County Commission for approximately 14 months. During those 14 months, the County Commission held dozens of meetings, at which the Commission exercised its executive and

_____

[2] Even the majority cannot escape this conclusion, stating that "[t]he State's *reinstatement* of th[e] practice [of gubernatorial appointment] did not constitute a change requiring preclearance." *Ante,* at 12 (emphasis added); see also, *e.g., ante,* at 7, 12. Of course, if there was no change, then there was nothing to *reinstate.*

6                    RILEY *v.* KENNEDY

administrative functions. During the time he served as a result of the special election, Jones was central to actions having a direct and immediate impact on Mobile County. For example, at a meeting held on October 13, 1987, the Commission considered 25 agenda items, one of which was paying claims and payrolls of over $1 million. Minutes from Meeting Oct. 13, 1987.

The differences between this case and *Fordice* are legion. In holding that the provisional registration system in *Fordice* did not constitute the baseline by which to measure future practices, we emphasized that the plan was abandoned as soon as it was clear that it would not be enacted, the plan was in use for only 41 days, and only about one-third of the election officials had even implemented the proposal. 520 U. S., at 283. Further, the State rectified the situation far in advance of any elections; there was no evidence that anyone was prevented from voting because of reliance on the rejected plan. *Ibid.*

*Fordice* was in essence a case of "no harm, no foul." Here, of course, the special election *did take place* and the elected commissioner held his post for 14 months, voting on hundreds of measures shaping the governance of Mobile County. While the voters in *Fordice* could be reregistered under the new procedures, Jones' election to the Commission and his 14-month service cannot be undone.

The majority seems to acknowledge that *Fordice* is distinguishable, stating that if "the only relevant factors were the length of time a practice was in use and the extent to which it was implemented, this would be a close case." *Ante*, at 15. The Court relies, however, on the "extraordinary circumstance" that the 1985 Act was challenged immediately and that the 1987 election was held "in the shadow" of that legal challenge. *Ante,* at 15–16. But a cloud of litigation cannot undermine the obvious conclusion that the special election practice was in force or effect. That practice, therefore, is the practice to which

STEVENS, J., dissenting

gubernatorial appointment must be compared.

The majority makes much of the fact that to adopt the view of the three-judge District Court would make the question whether a voting practice is "in force or effect" turn on whether the circuit court happened to get the law right in time to stop the election. *Ante*, at 17. But the majority's approach turns instead on whether Alabama possesses highly motivated private litigants. If Stokes had not challenged the election until it had already taken place (or had failed to appeal), the election *would be* in force or effect under the majority's view. Nothing in the VRA or our cases suggests that the VRA's application should hinge on how quickly private litigants challenge voting laws.

Our decisions in *Perkins* and *Lockhart* give no indication that if a citizen in Canton, Mississippi or Lockhart, Texas had challenged the legality of the ward elections or the numbered-post system, the illegality of those practices under state law would have been any more relevant to their status as the relevant baselines. This case calls for nothing more than a straightforward application of our precedent; that precedent makes clear that the special election procedure was the relevant baseline and that gubernatorial appointment therefore represents a change that must be precleared.

### III

The VRA makes no distinction among the paths that can lead to a change in voting practice, requiring preclearance "whenever" a State seeks to enact "any" change in voting practice. 42 U. S. C. §1973c. And changes to voting practice can arise in at least four ways: (1) legislative enactment; (2) executive action; (3) judicial changes, either by a proactive judicial decision (*e.g.,* redistricting) or, as in this case, through judicial interpretation of state law; or (4) informal abandonment or adoption by election officials.

STEVENS, J., dissenting

The majority does not dispute that a change in voting practice wrought by a state court can be subject to pre-clearance. See *ante*, at 11 (citing *Branch* v. *Smith*, 538 U. S. 254 (2003), and *Hathorn* v. *Lovorn*, 457 U. S. 255 (1982)). But the majority falters when it treats the change effected by *Stokes* differently for §5 preclearance purposes than it would treat a newly enacted statute or executive regulation. The majority finds it "anomalous" that Alabama might be bound "to an unconstitutional practice because of a state trial court's error." *Ante*, at 17. The clear theme running through the majority's analysis is that the Alabama Supreme Court is more deserving of comity than the Alabama Legislature.

Imagine that the 1985 Act had been held constitutional by the Alabama Supreme Court in *Stokes*, but that in 1988 the Alabama Legislature changed its mind and repealed the Act, enacting in its place a statute providing for gubernatorial appointment. Imagine further that the Department of Justice refused to preclear the practice (as it no doubt would); if Alabama wanted to fill an open seat on the Mobile County Commission it would have to administer its former special election practice even though that law had been repealed. It is not clear to me or to the United States, see Brief as *Amicus Curiae* 25–27, why effectively requiring a State to administer a law it has repealed is less offensive to state sovereignty than requiring a State to administer a law its highest court has found unconstitutional. The VRA "by its nature, intrudes on state sovereignty." *Lopez* v. *Monterey County*, 525 U. S. 266, 284 (1999).

The majority attempts to portray the circuit court judge's decision as so far outside the bounds of Alabama law, see *ante*, at 17, that allowing it to effectively establish the special election practice as a §5 baseline would be intolerable. I am certain, however, that the two Alabama Supreme Court Justices dissenting in *Stokes* would dis-

STEVENS, J., dissenting

agree. 534 So. 2d, at 239 (opinion of Steagall, J., joined by Adams, J.). The dissenting Justices argued that the 1985 Act was sufficiently "amendatory" to avoid the requirements of *Peddycoart* v. *Birmingham*, 354 So. 2d 808 (Ala. 1978), because it merely amended the 1957 Act creating the Mobile County Commission. The Circuit Court Judge followed similar reasoning, citing Alabama Supreme Court precedent stating that "[i]t is the duty of the courts to sustain the constitutionality of a legislative act unless it is clear beyond a reasonable doubt that it is in violation of the fundamental law." *Stokes* v. *Noonan*, CV–87–001316 (Mobile County, May 19, 1987). Nothing in the circuit court judge's decision indicates that this case calls for anything other than a straightforward application of our precedent.

## IV

Finally, the history of the voting practices that the VRA sought to address, especially in Alabama itself, indicates that state courts must be treated on the same terms as state legislatures for §5 purposes. Specifically, the history of Alabama's voter registration requirements makes this quite clear.[3] Alabama's literacy test originated in a constitutional convention called in 1901 "largely, if not principally, for the purpose of changing the 1875 Constitution so as to eliminate Negro voters." *United States* v. *Alabama*, 252 F. Supp. 95, 98 (MD Ala. 1966); see also M. McMillian, Constitutional Development in Alabama, 1789–1901, pp. 217–232 (1955); *Hunter* v. *Underwood*, 471 U. S. 222 (1985).[4] Not wishing to run directly afoul of the Fifteenth

---

[3] The NAACP Legal Defense and Educational Fund's *amicus* brief provides a history of the role that Alabama courts played in promoting and retaining discriminatory voting practices.

[4] The spirit of the Constitution's registration provision was captured by the statement of Delegate Heflin:

"We want the white men who once voted in this State and controlled

10                          RILEY *v.* KENNEDY

STEVENS, J., dissenting

Amendment, delegates at the convention devised a poll tax and a literacy test in order to disfranchise African-Americans. The effects of the new Constitution were staggering: In 1900, 100,000 African-Americans were enrolled as voters in Alabama. By 1908, only 3,742 African-Americans were registered to vote. *Alabama*, 252 F. Supp., at 99; V. Hamilton, Alabama: A Bicentennial History 96 (1977).[5]

The Alabama Constitution provided for judicial review of contested registrar decisions, see §186 (1901), but that review provision was rendered all but useless by the Alabama Supreme Court's adoption of both a strong presumption that the Board of Registrars' decisions were valid and stringent pleading requirements. For example, in *Hawkins* v. *Vines*, 249 Ala. 165, 30 So. 2d 451 (1947), the Alabama Supreme Court rejected a petition from a denial of registration because the petitioner averred that he "is a

─────────

it, to vote again. We want to see that old condition restored. Upon that theory we took the stump in Alabama, having pledged ourselves to the white people of Alabama, upon the platform that we would not disfranchise a single white man, if you trust us to frame an organic law for Alabama, but it is our purpose, it is our intention, and here is our registered vow to disfranchise every negro in the State and not a single white man." 3 Official Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901, To September 3rd 1901, p. 2844 (1941).

[5]Provisions following the lead of the 1890 "Mississippi Plan" were enacted in other State Constitutions, with similar results. See C. Zelden, The Battle for the Black Ballot 17–18 (2004) (describing similar changes to registration practice in Mississippi, South Carolina, North Carolina, Louisiana, Alabama, Virginia, Texas, and Georgia and their effects on registration); C. Woodward, Origins of the New South 1877–1913, pp. 321–349 (1951) (describing effect of Mississippi Plan on the States that adopted it). While poor white voters were also disfranchised to a significant degree, these provisions fell most heavily on African-American voters. See *id.*, at 342–343 (demonstrating that between 1897 and 1900 in Louisiana registered white voters dropped by about 40,000 and registered African-Americans dropped by approximately 125,000).

Stevens, J., dissenting

citizen of the United States," "is able to read and write," and "is over the age of twenty-one years," rather than expressly stating that he met those requirements at the time he attempted to register. *Id.,* at 169, 30 S. 2d, at 455 (emphasis deleted; internal quotation marks omitted). In *Hawkins* the Alabama Supreme Court also reaffirmed its previous holding in *Boswell* v. *Bethea*, 242 Ala. 292, 296–297, 5 So. 2d 816, 820–821 (1942), that the decisions of the Board of Registrars are "presumptively regular and valid and the burden is on the one who would attack the order to show error." 249 Ala., at 169, 30 So. 2d, at 454.

Alabama's literacy test was later amended via the "Boswell Amendment" to include a requirement that voters demonstrate that they were able to "understand and explain any article of the constitution of the United States in the English language." Ala. Const. §181 (1901) (as amended in 1946 by Amdt. 55). That amendment was held to be unconstitutional in *Davis* v. *Schnell*, 81 F. Supp. 872, 881 (SD Ala. 1949). Not easily deterred, the legislature responded with a new amendment, ratified in December 1951, which provided that the Alabama Supreme Court would promulgate a uniform questionnaire to be completed by all applicants. Ala. Const. §181 (1901) (as amended in 1951 by Amdt. 91); see *United States* v. *Penton*, 212 F. Supp. 193, 204, 205 (MD Ala. 1962) (reproducing questionnaire in App. B).

During the period from 1951 to 1964, the Alabama Supreme Court rendered the questionnaire more and more complex. In 1960, in response to the efforts of African-American organizations to educate voters, the questions were arranged in different sequences for different questionnaires. B. Landsberg, Free at Last to Vote: The Alabama Origins of the 1965 Voting Rights Act 19 (2007). These new questionnaires had the effect of blocking the registration of thousands of African-American voters. For example, as a district court in Alabama found, between

1954 and 1960 only 14 African-Americans were registered to vote in Dallas County—a county with approximately 15,000 African-Americans.  See *United States* v. *Atkins*, 323 F. 2d 733, 736 (CA5 1963).  Among the African-Americans denied registration were two doctors and six college graduates.  *Ibid.*

The Alabama Supreme Court responded to the litigation surrounding its questionnaire by drafting a new question-naire in 1964; that questionnaire had a literacy and civics test on which questions were rotated, resulting in 100 different forms of the test.  E. Yadlosky, Library of Con-gress Legislative Reference Service, State Literacy Tests as Qualifications for Voting 19 (1965).  The tests contained questions such as "Ambassadors may be named by the President without the approval of the United States Sen-ate. (True or False)," and "If no person receives a majority of the electoral vote, the Vice President is chosen by the Senate. (True or False)."  *Ibid.* (internal quotation marks omitted).[6]  These tests were finally put to rest throughout the country in the VRA, which mandates that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote."  42 U. S. C. §1973aa.

In sum, prior to the VRA, the Alabama Supreme Court worked hand-in-hand with the Alabama Legislature to erect obstacles to African-American voting.  While I do not wish to cast aspersions on the current members of the Alabama Supreme Court or the court that decided *Stokes* v. *Noonan*, 534 So. 2d 237, the history of the Alabama Supreme Court's role in designing Alabama's literacy test

---

[6]Some of other questions were "Are post offices operated by the state or federal government?," "When residents of a city elect their officials, the voting is called a municipal election (True or false)," "Of what political party is the president of the United States a member?," and "What is the chief executive of Alabama called?"  *United States* v. *Parker*, 236 F. Supp. 511, 524, 525, 528 (MD Ala. 1964) (reproducing the questionnaire).

STEVENS, J., dissenting

provides a vivid illustration of why voting changes wrought by state-court decisions must be treated on the same terms as those brought into effect by legislative or executive action.

V

There is simply nothing about this case that takes it outside the ordinary reach of our VRA precedents. Because the 1985 Act was precleared and put in effect during the 1987 election, the practice of special elections serves as the relevant baseline. With the correct baseline in mind, it is obvious that the gubernatorial appointment put in place by *Stokes* is a practice "different from" the baseline. Because gubernatorial appointment represents a change, it must be precleared, as the three-judge District Court correctly held.

I therefore respectfully dissent.